**UNITED STATES of America, Plaintiff,**

**v.**

**Leonard PELULLO, Defendant.**

**Civ. A. No. 94–276(DRD).**

United States District Court,
D.   New Jersey.

April 17, 1997.

Faith S. Hochberg, United States Attorney by Mark W. Rufolo and Leslie Faye Schwartz, Assistant U.S. Attorneys, for plaintiff.

Herbert Beigel, Aaron C. Horowitz, Beigel, Lasky, Rifkind, Fertig Gelber & White, New York City, for Defendant, Leonard Pelullo.

**OPINION**

DEBEVOISE, District Judge.

### TABLE OF CONTENTS

I   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   740

II   Summary of the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   744

    A.   Compton Press, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   744
    B.   the Granada–DWG Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   745
    C.   The Away to travel South Transfer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   747
    D.   The UNUM Annuity Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   749

III   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   750

    A.   Sufficiency of the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   750
    B.   Money Laundering Counts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   751
    C.   Brady, Giglio, Jencks Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   753

        1.   Interview of Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   753
        2.   Heine Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   754
        3.   UNUM Contract Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   756
        4.   Gerardi, Marqueen and Derrick Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   756
        5.   Other Brady, Giglio, Jencks Contentions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   757

    D.   Miscellaneous Contentions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   759

        1.   Hearsay Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   759
        2.   Attorney/Client Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   759
        3.   Rule 404(b) Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   759
        4.   Jury Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   759
        5.   Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   760
        6.   Prosecutorial Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   760
        7.   Refusal to Grant Continuance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   760
        8.   Forfeiture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   761

IV   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   761

In November 1996 a jury found defendant, Leonard Pelullo, guilty on one count charging him with conspiracy to embezzle $4.176 million from two employee pension benefit plans and to engage in money laundering, on 11 counts of embezzlement from these employee pension benefit plans, and on 42 counts of money laundering. Defendant has moved for a judgment of acquittal or a new trial on the following grounds:

1. The Government violated its obligations under *Brady, Giglio*, and Jencks, by, among other things, not producing (and/or destroying) notes, reports and 302s of interviews with witnesses, and not producing all of the relevant files of the defendant seized in the search of his warehouse.

2. The Government knowingly presented perjured and/or false testimony, and failed to correct that false testimony.

3. The Government improperly presented hearsay testimony in the guise of co-conspirator statements which were never connected to the conspiracy.

4. The specific transactions charged as money laundering neither promoted the embezzlement, nor were designed to conceal or disclose in violation of 18 U.S.C. § 1956(a)(1).

5. The indictment was brought after the statute of limitations had expired.

6. The court failed to grant the defense's request for a continuance, and thus did not provide the defense with adequate time to prepare which resulted in ineffective assistance of counsel.

7. The government violated the defendant's attorney-client privilege.

8. The government improperly inserted the civil standard under ERISA through the testimony, closing arguments and jury instructions, as the basis for finding the defendant guilty of a crime.

9. The Government made improper statements during this closing and rebuttal arguments, including references to Mr. Pelullo's decision not to testify, vouching for witnesses, and improperly characterizing the evidence.

10. The amount of the forfeiture is in error.

11. There was insufficient evidence to prove a violation of 18 U.S.C. § 664 (embezzlement).

12. There was insufficient evidence to prove a violation of 18 U.S.C. § 371 (conspiracy).

## I. *Background*

On December 9, 1994 a grand jury sitting in Newark, New Jersey, returned a 54 count indictment against defendants Leonard Pelullo and Raul Corona.

Count 1 charged a two-part conspiracy. First, defendants and others were accused of conspiracy to embezzle approximately $4,176,000 belonging to the Compton Press Employees' Profit Sharing Retirement Plan (the "Retirement Plan") and belonging to the Compton Press Employees' Thrift Plan (the "Thrift Plan") contrary to 18 U.S.C. § 664. (The two Plans will be referred to collectively as the "Employees Benefit Plans"). Second, defendants and others were accused of conspiring to commit money laundering offenses, namely, to conduct financial transactions that involved the proceeds of unlawful activity (the thefts from the Employees Benefit Plans) with the intent to promote the unlawful activity and knowing that the financial transactions were designed to conceal the nature and ownership of the proceeds of the unlawful activity contrary to 18 U.S.C. § 1956(a)(1).

Counts 2 through 12 each charged that the defendants embezzled an amount of money or assets of one or the other or both of the two Employees Benefit Plans. Counts 13–54 each charged that the defendants engaged in a specific transaction which constituted an act of money laundering.

Prior to trial the charges against Corona were dismissed for the reason that the government used information immunized during proceedings in the Middle District of Florida to obtain the indictment against him in the District of New Jersey. *United States v. Pelullo,* 917 F.Supp. 1065 (D.N.J.1995).

Pertinent to the pending motions are two other pretrial proceedings in the cases and the information developed during those proceedings. The first of these proceedings was Pelullo's motion to dismiss the indictment for the reason that the government seized and made use of documents protected by the attorney-client privilege. The second of these proceedings was an extended Fed. R.Evid. 104 *in limine* evidentiary hearing to establish the authenticity of the vast array of documents upon which the government intended to rely to establish its case. Information developed in connection with the privilege motion and in connection with the *in limine* hearing bear upon the merits of Pelullo's pending motion.

The privilege motion required an inquiry into some of the many governmental investigations of Pelullo, some of the civil proceedings in which Pelullo was involved, and the existence and disposition of documents assembled in or created by those investigations and proceedings.

In 1991 a Florida state grand jury was investigating Pelullo. At the same time a federal grand jury was sitting in the Middle District of Florida. It was investigating allegations of bankruptcy fraud and related offenses by Pelullo and others involving the Ryder/PIE concerns. During the course of that investigation a warrant was issued authorizing the search of a 2,400 square foot warehouse located at 6985 N.W. 82nd Avenue, Miami, Florida. The warehouse contained the records of 25 Pelullo companies, including Compton Press, Inc. and other companies which figure in the embezzlements charged in the present case. The FBI seized from the warehouse 904 boxes of documents, 114 file cabinets containing documents and 10 file cabinet drawers of corporate and financial records.

While the United States Attorney in the Middle District of Florida was investigating the Ryder/PIE embezzlements, the New Jersey United States Attorney's Office was investigating the Compton Press matter. Special Agent Rosario Ruffino of the United States Department of Labor, Office of Racketeering traveled to Florida in the fall of 1991, conferred with the FBI agent in charge

of the Florida federal investigations, and brought back to Newark six boxes of original documents seized during the search of the Miami warehouse.

In his Florida grand jury testimony, Corona described the manner in which Pelullo conducted his many businesses. He created companies, affiliated companies and subsidiaries by the dozens. He transferred employees back and forth among them. He funnelled money through and between these companies. As Corona described it:

> The other thing is that the way he controlled his companies was like if they're all his—they're all his companies and all the money funnels down into one pool, and wherever he needs it, he sends it, irregardless to what, whose money. Which other company it belongs to or what their responsibilities are tomorrow. It's he needs it today here, this resolves the problem for today, and we'll worry about tomorrow tomorrow. We made it through today. And every day is just making it through that one day.
>
> He did think about the relationship of the other companies in how he passed the money through to wherever he needed it. He would funnel it through the company that was the parent of the company he was sending it to from the company that was under But it never—other than that, it never held him back on where he would put the money, as to—it was a matter of strictly where he needed it, where his priorities were the day—the day that you were in front of him.

Grand Jury Transcript at 16.

Notwithstanding the manner in which Pelullo dispatched money here and there, he maintained accurate record of the flow, generating vast amounts of accounting records. Twenty-five of his companies were listed in the search warrant for the Miami warehouse.

All these records were stored in the Miami warehouse. As Pelullo testified before Judge Kelly in the Eastern District of Pennsylvania, "Every document that I had generated in the last 20 years was in that warehouse." They were in a disorganized state and often mislabeled. Interspersed among the financial and corporate records were the boxes which Pelullo claims contained privileged material. For the reasons set forth in my October 18, 1995 opinion, I rejected this claim and denied Pelullo's motion to dismiss the indictment.

Pelullo has been the subject of criminal proceedings in the Eastern District of Pennsylvania for a number of years.

On July 3, 1991 a jury convicted Pelullo of 49 counts of wire fraud and one count of racketeering for engineering schemes whereby Pelullo utilized the Royale Group, Ltd., and its affiliates to defraud American Savings & Loan and Royale's shareholders. On May 12, 1992, the Court of Appeals affirmed the conviction of wire fraud on Count 54, reversed the conviction on all other counts and remanded the case for retrial. *United States v. Pelullo,* 964 F.2d 193 (3d Cir.1992). Since then the case has been retried three times and twice more went to the Court of Appeals, all as described in *United States v. Pelullo,* 105 F.3d 117 (3d Cir.1997).

In September, 1989, Harry J. Gerardi and Coolidge I. Marqueen, two of the trustees of the Compton Press, Inc. Employees Benefit Plans, seeking to protect the assets of the plans, instituted a civil action in the United States District Court in this district, *Gerardi v. Pelullo,* Civil Action No. 89–4069. Named as defendants were Pelullo and Corona along with other individuals and corporate entities. The complaint alleged that Pelullo and the other trustees in league with him had breached their duties to the plans and dissipated fund assets. In particular, the plaintiffs challenged the three transactions which are the subject of the present indictment: (i) the $1.150 million loan to Granada Investment, Inc., (ii) the $1,326 million loan to Away to Travel South, Inc., and (iii) the converting of the $1.7 million annuity contract with Union Mutual Life Insurance Company ("UNUM").

Subsequently, Daniel F. Dacey and Dorothy S. Patten intervened on behalf of all the employees of Compton Press, Inc. and participants in and beneficiaries of the two plans.

On November 14, 1989, the court approved a stipulation of plaintiffs and the defendants appointing Summit Trust Company as trustee of the plans. On January 24, 1990, the defendants and the intervenors entered into a memorandum of understanding. On May

21, 1990, plaintiffs and defendants executed a consent order and settlement agreement which, although not agreed to by the intervenors, was entered by the court on May 22, 1990.

Defendants in the case failed to make certain payments required of them. On July 26, 1990, there was entered an amended stipulation of settlement and consent order agreed to by plaintiffs, defendants and intervenors.

The law firm of Wilentz, Goldman & Spitzer signed the stipulation and order on behalf of defendants David G. Hellhake, David Neifeld, Raul Corona, Moshe Milstein, Alan Weisberger and Compton Press, Inc. Pelullo appeared in the case and signed the stipulation and order "Pro Se."

Documents generated in the Eastern District of Pennsylvania criminal proceedings and in the New Jersey civil proceedings found their way to the Miami warehouse.

As will be developed in the review of the evidence produced at the trial of this case, Pelullo and his associates were engaged in other litigation. Documents and testimony derived from these various legal proceedings are the subject of Pelullo's pending motion.

In addition to Corona's and Pelullo's pretrial motions; described above, at the government's request a hearing pursuant to Rule 104 of the Federal Rules of Evidence was held in order to determine the authenticity of the records and the admissibility of summary charts which, based upon the records, trace the flow of funds from the Employees Benefit Plans to their ultimate destination.

During the New Jersey investigation, subpoenas were served on various banks, brokerage houses, law firms and other persons and entities, and pursuant to those subpoenas a vast number of documents was produced. In addition, documents were obtained from the United States Attorney's Office in the Middle District of Florida. These documents had been seized during the course of the search of the warehouse described above.

At the hearing, the various custodians of the subpoenaed documents identified them and testified about the manner in which they were made and maintained. In addition, Rosario Ruffino testified. He was the Special Agent of the United States Department of Labor, who had primary responsibility for investigating and preparing this case. In his testimony and in a supplemental affidavit he described how the documents had been obtained and how the summary charts had been prepared.

Ultimately, I rejected Pelullo's objections to the documents and ruled that all of them had been properly authenticated and were admissible. I also held that the information in the summary charts was based upon the documents and that the charts were admissible. I reserved to Pelullo the right to compare copies of the documents with the originals and to file objections to any individual document which appeared subject to challenge and to move to redact any information on any summary chart which appeared to be based on something other than an authenticated document. By the time trial commenced the summary charts had been refined, and there was no challenge to the authenticity of the underlying documents or to the accuracy of the manner in which the charts showed the flow of funds.[1]

The superseding indictment charges that Pelullo conspired to and actually did commit three series of embezzlements from the Employees Benefit Plans.

The first series of embezzlements consisted of transferring $1.150 million from Kidder Peabody, Merrill Lynch and A.G. Edwards Retirement Plan accounts. A chart (G1000) traces the flow of funds out of the three Employees Benefit Plan brokerage accounts either directly or indirectly into a bank account of a Pelullo corporation, Granada Investments, Inc. ($750,000) or to another Pelullo corporation, Paribas ($400,000). G1000 shows the numerous payments of these funds

---

1. The charts accompany the opinion as appendices. Exhibits G1000 and G1100 reflect the $1,150 million Granada/DWG Corp. transactions. Exhibits G2000–G2600 reflect the $1.326 million Away to Travel South Transactions. Exhibits G3000, G3100 and G3200 reflect the liquidation and transfer of $1.7 million UNUM annuity contract proceeds.

made from the Granada Investments account.

G1100 shows the delivery of 19,900 shares of DWG Corp. stock held in the Shearson Lehman Thrift Plan account to a Shearson Lehman Compton Press, Inc., corporate account and then to an A.G. Edwards Compton Press, Inc. corporate account. There they were liquidated and the proceeds remitted to the Summit Trust Company Compton Press, Inc. operating account. G1100 shows the many entities to which these funds were disbursed from that account. These transfers were not charged as criminal offenses in the indictment but were part of Pelullo's overall plan to use fund assets to acquire DWG Corp.

The second series of embezzlements charged in the superseding indictment consisted of the transfer of $1,326 million from Employees Benefit Plan accounts at A.G. Edwards, Shearson Lehman and Dean Witter to Employees Benefit Plan accounts established at Imperial Bank in Florida. From there the funds were transferred to an Adorno, Zeder, Allen Trust–Escrow Account at the Barrett Bank in Florida. A dizzying array of payments and transfers of funds followed the deposit in the Adorno, Zeder, Allen Trust–Escrow Account, a significant portion of which was designed to facilitate an investment in a bankrupt travel agency, Away to Travel South. The flow of these funds is shown in Exhibits G2100, G2200, G2300, G2400, G2500, and G2600. Exhibit G2000 shows the source of $960,000 paid to the bankruptcy examiner for Away to Travel South.

The third embezzlement charged in the superseding indictment consisted of the loss occasioned by the unnecessary incurring of a $330,000 liquidation charge and the transfer of $1,400,000 proceeds of a UNUM Life Insurance Company Group Annuity Contract owned by the Retirement Plan. Exhibits G3000, G3100 and G3200 show how the proceeds of this Retirement Plan asset were expended.

These summary charts, the accuracy of which is beyond challenge, and the records which support them, the authenticity of which is unquestioned, alone constitute over-whelming evidence that the Employees Benefit Plans were systematically looted.

Pelullo throughout the trial sought to establish the legitimacy of the three diversions from the Employees Benefit Plans. He portrayed the liquidation of the Plans' brokerage accounts and the payment of the proceeds to Granada Investments, Inc. ("Granada") as a legitimate investment of the assets of the Plans. Similarly he portrayed the payments of Plan funds on account of the Away to Travel South deal as a sound investment of Plan assets. Finally, Pelullo portrayed the liquidation of the UNUM insurance policy as the elimination of an investment which had a low rate of return. He contends that he was unaware that the $1.4 million deposited in Compton Press operating account was the proceeds of the UNUM policy and that when he ordered disbursement of that money he was still unaware of its source.

The evidence, which overwhelmingly establishes that Pelullo was the mastermind behind the looting of the Employees Benefit Plans, will be discussed in some detail below. In summary it shows that Pelullo was engaged in a multitude of business ventures; that to carry out these ventures he created a dizzying array of corporate and partnership entities, each with its own bank accounts; that he transferred funds and assets back and forth between these business entities to meet his own needs and in total disregard of the interests of the various business entities or their participants; that he had at his beck and call a stable of associates and employees, some corrupt, some unsophisticated and naive, some young and ambitious, but all dominated by him and willing to follow his direction; that only Pelullo knew the whole picture and kept track almost daily of every significant deposit into and out of every account; and that the funds withdrawn from the Employees Benefit Plan flowed by complex and devious routes into businesses Pelullo was trying to acquire or were diverted to Pelullo's personal or family interests or to pay his personal expenses. Pelullo utilized the complexity of his business structures and money transfers to conceal from the world the nature of his financial dealings.

## II. *Summary of the Evidence*

■ Three of the grounds which Pelullo advances to support his motion for a judgment of acquittal or a new trial challenge the sufficiency of the evidence. He contends that there was insufficient evidence to prove a violation of 18 U.S.C. § 664 (embezzlement), that there was insufficient evidence to prove a violation of 18 U.S.C. § 1956(a)(1). In determining the sufficiency of evidence a Court "must view the evidence and inferences logically deducible therefrom in the light most favorable to the government."

A. *Compton Press. Inc.:* Compton Press, Inc. commenced its operations in the 1950's. It was in the business of printing high quality color printing. Its clients included Fortune 500 companies, including AT & T, Bell Labs, IBM and Nabisco.

During the 1970's and until 1987 three persons owned and managed the company— Don Derrick, Harry Gerardi and Cooledge Marqueen. The company operated successfully and routinely paid its suppliers sufficiently promptly to receive early payment discounts.

In 1966 Compton Press established the Retirement Plan. Contributions were made on an annual basis from profits. There were discretionary payments, but the owners made them each year. The contributions were assigned to employees in proportion to their salaries. Since the owners received higher salaries, their shares of the Retirement Plan were higher than those of lower level employees.

In 1978 Compton Press established its Thrift Plan. Employees contributed to the Plan and the company matched a percentage of the moneys deposited by the employees. Contributions to the Plan ceased in 1987, and a new 401K plan was instituted which was administered outside the company. The funds in the Thrift Plan, however, continued to be administered on behalf of the participants.

Marqueen and Gerardi served as trustees of the Plans, and the three owners constituted the committee which had the authority to direct the trustees with respect to investments.

In 1987 the owners of Compton Press sold the company to an entity called Equity Finance Group organized by Moshe Milstein and Alan Weisberger. Glenfed Financial financed the purchase through a leveraged buy out. Compton Press entered into a loan agreement with Glenfed Financial and had to repay the loan out of its earnings. The owners had been paid for the company and the company was repaying the loan which provided the funds for the purchase price. This placed a degree of financial pressure on Compton Press and it was no longer able to pay its suppliers on a discount basis.

Gerardi and Marqueen remained with Compton Press temporarily under a consulting arrangement and remained as sole trustees of the Employees Benefit Plans. Disagreement arose between Marqueen and Gerardi an the one hand and Milstein and Weisberger on the other. Despite negotiations to sell the company back to Marqueen and Gerardi, on May 16, 1989 Weisberger and Milstein sold a controlling interest in Equity Finance Group (the owner of Compton press) to GI Enterprises, a company which Pelullo controlled. The transaction was accomplished by the issuance of additional shares of Equity Finance Group and by GI Enterprises promising to invest $2 million in Equity Finance Group by November 1989.

In this manner Pelullo achieved control of Compton Press. He named himself chairman of the board and chief executive officer of Equity Finance Group and vice-chairman of the board of Compton Press. He designated David Hellhake executive vice president of Equity Finance Group, vice-chairman of the board of Compton Press and vice president and secretary of Compton Press.

When Hellhake was 20 years old he went to work for Pelullo's wife on Pelullo's farm in Pennsylvania. Shortly afterwards he started working for Pelullo, as grounds keeper, farm project manager, and later handling farm expenses. Pelullo asked Hellhake to work for him on construction projects in Florida, which Hellhake did when he was in his mid twenties. Gradually Hellhake became totally immersed in Pelullo's businesses, performing

all manner of business and personal services for Pelullo, holding titular offices in many of the Pelullo corporations.

Hellhake was located in Pelullo's Miami office where from 20 to 50 persons were employed. These persons included Bonnie Lynn, Janice Larson and Raul Corona. Like the others who surrounded Pelullo, he was given many high sounding titles, but he made no decisions without Pelullo's instructions. The witnesses from the Miami office testified that Pelullo received copies of all mail, that he personally opened all bank statements and that each day he reviewed the daily cash reports prepared for his many companies.

When Pelullo took over Compton Press the company had a bank account at Summit Trust Company known as the general account. Pelullo opened a new account at Summit Trust called the Compton Press Operating Account which was referred to throughout the trial as the "174 Account". The signatures on the account were the Miami based Pelullo employees Hellhake, Corona and Larson.

As for the Employees Benefit Plans, within a week of his acquisition of Compton Press Pelullo created a directors' resolution stating that effective May 19, 1989 he and Hellhake were the new committee and appointing Hellhake as sole trustee. Corona was added later as a committee member and trustee. Thus Pelullo positioned himself to control both Employee Benefit Plans. Participants in the Plans started experiencing delays in payments from the Plans when they retired and were given various excuses.

B. *The Granada—DWG Transfers:* The transactions comprising the first embezzlement from the Employee Benefit Plans are depicted in G1000 and G1100. In substance Pelullo withdrew funds from the Plans to further his acquisition of DWG Corp., as well as to pay for personal expenses.

Well before the acquisition of Compton Press Pelullo sought to acquire control of DWG Corp., a holding company for Arby's and Royal Crown Cola. DWG Corp. was controlled by Victor Posner, for whom Pelullo had previously worked as a consultant.

Pelullo established Granada Investments, Inc. to acquire DWG Corp. Granada Investments, Inc. was the general partner of Granada Investments, L.P. The limited partners included Andrew Heine, a New York lawyer about whom more will be said; Andrew Heine's children, G.H. Enterprises, a company owned by David Hellhake's father, Peter L. Pelullo, defendant Pelullo's father, LBO Associates 1, and LBO Associates 2. The LBO Associates 1 and 2 were affiliated with BMA Group.

Fairview Financial Corp. was a Pelullo controlled holding company owned by trusts established for Pelullo's father, wife and children. It was a limited partner in Granada Investments LP.

Heine was assigned the task of being the front man for the takeover. He was a member of a prominent New York law firm and had an aura of respectability. He was to deal with the investment bankers and the press. Pelullo was to secure the financing and administrative support for the DWG Corp. takeover.

Pelullo purchased large amounts of DWG Corp. stock through a number of brokerage houses. The stock was heavily margined, and as the price fell Pelullo was under pressure to either sell some of the shares or come up with more cash.

The takeover attempt turned hostile and Granada instituted a shareholders suit against DWG Corp. and its directors, charging that DWG Corp. was not fair in not presenting Granada's tender offer to the stockholders.

Notwithstanding the directors' resolutions appointing Pelullo, Hellhake and Corona trustees and Employees Benefit Plan committee members, Gerardi and Marqueen believed that they still held those positions. Pelullo did nothing to disabuse them of that belief. He directed Hellhake to persuade Gerardi and Marqueen to move pension fund assets to brokers with whom Pelullo dealt when purchasing DWG Corp. stock. As a result Employees Benefit Plan funds were deposited at Shearson Lehman in New York and at A.G. Edwards.

In May and June of 1989 Pelullo was in need of funds to continue with the DWG Corp. takeover. He had agreed to buy out the interests of BMA Group in Granada Investments. LP for $350,000. Substantial sums were needed to pay the fees of investment brokers and other expenses.

Pelullo informed Hellhake of these needs and directed him to persuade Gerardi and Marqueen to invest Plan moneys in Granada Investments, Inc. Hellhake informed Gerardi and Marqueen that Pelullo and Hellhake's father had invested in Granada and that there would be a high rate of return. Gerardi and Marqueen were persuaded by these representations and authorized the transfer of $150,000 from the Retirement Plan Kidder–Peabody account and $600,000 from the Retirement Plan Merrill Lynch account to Granada Investments, Inc.

Hellhake had failed to disclose to Gerardi and Marqueen the litigation in which Granada was engaged concerning the DWG Corp. takeovers. He failed to disclose that $350,000 was to be used to buy out the BMA Group. He failed to disclose that more than $400,000 of pension money was to be used to repay the Pelullo family corporation, Fairview Financial, for expenses which it had incurred during the DWG Corp. takeover efforts.

Within days of authorization of the transfers to Granada, Gerardi and Marqueen became suspicious and demanded written confirmations of the value of Granada's assets and as to their ownership. Their request was not honored.

Exhibit G1000 shows the manner in which funds paid into Fairview Financial were expended for the benefit of Pelullo and his family, e.g., $20,000 to Silver Sands, the company set up to handle mortgage and household expenses for Pelullo's estate in Coconut Grove, Florida; $5,000 and $20,000 to accounts of Doe Run Farms and Doe Run Land, the farm that Pelullo owned in Chester, Pennsylvania; $25,000 to an account in the name of Pelullo's father, Peter Pelullo Real Estate; multiple payments to One Plaza Corp., the corporation established to handle the business and payroll expenses of Pelullo's Miami office.

In July 1989 Pelullo informed Hellhake that an additional $400,000 was needed from the Employees Benefit Plans to pay Paribas, a new investment broker retained to handle the DWG Corp. takeover. Without the knowledge of Gerardi and Marqueen these funds were channeled from the Retirement Plan to Paribas. On July 6, 1989 $200,000 was transferred from the Compton Press Summit Trust Co. general account to Andrew Heine. On July 11 and 12 there was transferred a total of $400,000 from Retirement Plan account at A.G. Edwards to a Retirement Plan account in the Imperial Bank in Florida. On July 12 $200,000 of this $400,000 was used to replace the $200,000 drawn from the Compton Press general account, passing it through the Compton Press Summit Trust Co. operating account. On July 14 $200,000 of the $400,000 was transmitted to Heine, bringing the total sent to him to $400,000. During the period July 12–14 Heine paid the $400,000 to Paribas on account of its broker's fee.

Hellhake and Pelullo not only failed to disclose this diversion to Gerardi and Marqueen, Pelullo informed the broker at A.G. Edwards that the money was being withdrawn to pay plan participants who were about to retire.

It is unnecessary to describe in detail the transactions shown in Exhibit G1100. Suffice it to say they represent additional instances in which Pelullo used Employees Benefit Plan assets to further his DWG Corp. takeover project and in which Pelullo diverted Plan assets to his own interests.

In August 1989 Gerardi and Marqueen learned about the $400,000 which was withdrawn from the Retirement Plan account. They confronted Pelullo who gave them a Fairview Financial note for $400,000 payable on demand. Demand was made. The check in payment of the note bounced twice. Gerardi and Marqueen threatened to complain to the Department of Labor concerning the apparent mishandling of the Plans' funds.

On September 20 Pelullo terminated Gerardi and Marqueen from the company and formally removed them as trustees of the two Employees Benefit Plans. On September

22,1989 Gerardi and Marqueen instituted a civil action in the federal court against Pelullo, Hellhake and others concerning the $750,000 and $400,000 that had been taken from the Plans in connection with the Granada Investments transactions.

During the August–September period there occurred maneuverings on the part of Pelullo, Hellhake and Heine which assume monumental proportions in Pelullo's moving papers but which are of utter insignificance insofar as the proofs in this case are concerned. In August 1989 when Gerardi and Marqueen discovered the $400,000 diversion from the Retirement Plan, there was nothing in the files of the Plan to evidence either the earlier $750,000 payment or the $400,000 payment. Pelullo wanted a paper record to support a so-called $1,150,000 investment. He asked Heine, as president of Granada Investments, Inc. to sign promissory notes on behalf of Granada payable to the Retirement Plan. They could be placed in Plan's records and make it appear as if it had received value for the funds which had been extracted from it. Heine, a shrewd and manipulative lawyer, was naturally reluctant to put his name on such instruments. He admitted at trial that he signed a $400,000 note but denied that he signed notes for the $750,000 (one in the amount of $600,000 and one in the amount of $150,000). He was confronted on cross-examination with answers to interrogatories in a civil case in which he appeared to vouch for the genuineness of his signature on the $750,000 notes. There was testimony of Bonnie Lynn that Heine's signature was placed on one of the notes in 1990 at Pelullo's Miami offices. There was testimony of Hellhake that he brought the notes to Heine's office and believed that they had been signed.

It is completely inconsequential when or if Heine signed the notes. The fact of the matter is that the overwhelming weight of the evidence establishes that between June and July Pelullo orchestrated the diversion of $1,150,000 (20% of its assets) from the Retirement Plan for his own purposes. The thought of slipping notes into the records of the Plan did not arise until late August or September 1989 after Gerardi and Marqueen became highly suspicious of the nature of the Plan payments. The significant fact is that Pelullo sought to provide some cover for his actions by creating notes in the amount of $1,150,000. Whether be succeeded in having Heine sign these notes is of no moment whatsoever.

C. *The Away to Travel South Transfers:* In the 1960's Joseph Vendi started a travel agency known as Ambassador Travel. It was located in stores owned by Federated Department Stores in a number of states. Its headquarters was in Miami. The agency prospered for many years but suffered reverses in late 1988 and early 1989. Vendi sought a purchaser and was put in touch with Pelullo. Pelullo expressed an interest in a travel agency which would complement the hotels with which he was involved in Miami. Pelullo advanced approximately $190,000 to Vendi to enable Ambassador to pay a debt to Airline Reporting Corporation ("ARC"), which issued airline tickets to travel agencies.

Despite this infusion of funds, in January 1989 Ambassador Travel filed a Chapter 11 petition in the bankruptcy court. Pelullo sought investors to join with him in buying the agency. He approached Fred Schwartz, an attorney at the Adorno, Zeder law firm, who interested his father, Murray Schwartz. The father had owned, but not managed, travel agencies in the past.

Deception reigned from the outset. The Schwartz' formed Away to Travel South, Inc. ("ATTS") to buy the assets from the bankruptcy estate. Murray Schwartz was to own 100% of the stock and would put up 30% of the purchase price. Pelullo told Fred Schwartz that the Hellhake group, let by David Hellhake's father, would put up the remaining 70%. In fact Hellhake's father had no interest in the travel agency. Pelullo intended to secure the remaining 70% but did not want Murray Schwartz to know of his involvement.

It was agreed that initially the 70% would be reflected as a loan to ATTS, but the "Hellhake Group" could convert the 70% into a 70% ownership interest, at which time it would buy out Murray Schwartz' 30%.

Hellhake reviewed the Ambassador Travel financial statements filed in the bankruptcy court and concluded that the agency was not a good business prospect. Further he testified that he believed that $2 to $3 million would be needed for start up costs. He so informed Pelullo.

Ambassador Travel was heavily in debt, including a loan owing to Ocean Bank in the amount of $1.5 million secured by Vendi's house, two buildings and securities owned by his father. Claims of customers were estimated to be between $600,000 to $800,000, and turned out to be more than $1 million. The Internal Revenue Service was owed $300,000 to $400,000, and ARC was owed more than $1 million. This was the business into which Pelullo was ultimately to divert Compton Press Employees Benefit Plan funds.

ATTS agreed with the bankruptcy examiner, Joseph Beck, to purchase the travel agency. The consideration was $950,000 (ultimately $960,000) and assumption of the $1.5 million obligation to Ocean Bank (which ATTS never paid).

Exhibit G2000 reflects the September 11, 1989 payment of $960,000 to the bankruptcy examiner. It also reflects that of this amount $250,000 came from the Schwartz Group and the balance came from various Pelullo companies.

Within a week after the purchase of the agency Pelullo suggested to the Schwartzs that the Compton Press Employees Benefit Plans lend money to ATTS to enable ATTS to pay back the investors. By that time, of course, Gerardi and Marqueen were no longer trustees and committee members. Only Pelullo people filled those positions. Loan documents were executed on October 13, 1989 pursuant to which the Retirement Plan and the Thrift Plan were to loan $1.3 million to ATTS secured by virtually worthless assets (leases at Federated Department Stores, furniture which ATTS owned at 30 locations and the unsecured guarantees of two corporations which had no assets). Pelullo testified falsely in the civil action which Gerardi and Marqueen had instituted in the federal district court that the loan was secured by $3 million worth of assets and a personal guarantee of Murray Schwartz. No such guarantee existed.

Exhibit G2100 reflects the liquidation of the assets of the two Employees Benefit Plans held at A.G. Edwards, Kidder Peabody, Shearson Lehman and Dean Witter, the transfers of the proceeds of the liquidation to accounts at Imperial Bank and the subsequent transfers of $1.326 million to the Adorno, Zeder trust account.

Exhibit G2200 reflects the disbursement of $1,297,000 of Employee Benefit Plan moneys—all at the direction of Pelullo and Hellhake. Almost all of these disbursements were made before the ATTS loan documents were executed. The members of the Schwartz Group were repaid a portion of their original investments. The balance of the $1,297,000 was paid to Pelullo controlled companies, well in excess of money they invested in ATTS. None of the moneys went to ATTS for working capital or any other purpose.

The manner in which the balance of the $1,297,000 passing to Pelullo controlled companies was spent can be traced in Exhibits G2200, G2300, G2400, G2500 and G2600. These exhibits portray how these funds were used to further the business interests and pay personal expenses of Pelullo and members of his family.

Meanwhile, ATTS having received none of the proceeds of the so-called "loan" from the Employees Benefit Plans, was subject to Pelullo's continuing monitoring and manipulation for his own benefit. It paid none of the Ocean Bank obligation it assumed in the bankruptcy court proceeding (causing Vendi to lose his house and buildings and causing Vendi's father to lose the securities he had posted). It did not make the interest payment to the Employees Benefit Plans due on January 1, 1990 on account of the $1.35 million loan. It made no other payments to the Plans on account of the loan obligation.

No reasonable person could conclude that the ATTS "loan" was anything other than an elaborate scheme on Pelullo's part to extract $1,326 million from the Employees Benefit Plans to use for his own business and personal purposes.

D. *The UNUM Annuity Contract:* One of the assets of the Retirement Plan was the UNUM annuity contract. It had two termination provisions pertinent to this case. Under § 6.2 of the contract there was a five-year payment. The first payment would occur 90 days after notice of termination and then annual payments would be made thereafter. The full amount of the policy would ultimately be paid and interest would be paid during the payout period.

Under § 6.3 the policy holder could request total termination. One payment would be made within 90 days. However, under a formula prescribed in the polity an amount less than the fund balance would be paid. In other words, there was a prepayment penalty.

In January 1989, before Pelullo had acquired Compton Press, Gerardi and Marqueen, as Retirement Fund trustees and committee members, elected to terminate the UNUM contract pursuant to the § 6.2 five year payment provision. The first payment of $333,146 was made in April 1989 and was deposited in the Merrill Lynch Retirement Plan Account.

In May 1989 Pelullo had acquired Compton Press. It will be recalled that in August 1989 Gerardi and Marqueen first learned that $400,000 had been withdrawn from the Retirement Plan account (although they did not learn that it had been withdrawn to pay the fees of Paribas, the new broker in Pelullo's DWG Corp. takeover project). It will also be recalled that they challenged Pelullo about that withdrawal and about the total lack of documentation of the $750,000 Granada "loan", and that on September 20 Pelullo terminated their employment with Compton Press and removed them as trustees and committee members of the Employees Benefit Plans.

While that was going on Pelullo, who had named Hellhake and Corona Plan trustees and committee members, instructed Corona to terminate the UNUM contract—another step in Pelullo's relentless pursuit of cash. In September Corona made inquiries of UNUM and received copies of the UNUM contract and of the Gerardi and Marqueen letter requesting discontinuance. Corona as-certained that a loan against the policy could not be obtained because it had been terminated. On October 2, 1989 UNUM informed Corona, at his request, that the market value of the contract was $1.4 million with a fund balance of $1.7 million. On October 30, 1989 Hellhake and Corona gave written instructions to UNUM to terminate the UNUM contract pursuant to the § 6.3 immediate termination provision. On November 8 Hellhake and Corona instructed UNUM to send $1,373,062.98 to Summit Trust for deposit in a Compton Press Retirement Plan account bearing the number 28028300271 (the "271 account").

Thereafter there were communications between UNUM representatives and Corona concerning the exact amount of the payment and the manner of transmitting it. Corona directed that the payment be sent on November 30, and on that day UNUM wired $1,399,012.42 to the 271 account at Summit Trust. The liquidation charge resulting from the immediate termination was $330,139.

For some reason the 271 account had not yet been opened and the funds were deposited in the Compton Press operating account (the "174 account"). In his moving papers Pelullo makes much of the confusion generated by this account mix-up and when Pelullo was informed of it, but all of that is of little moment.

It is unnecessary to refer to the testimony of a number of witnesses who spoke to Pelullo about the erroneous deposit of the UNUM funds both before and after Pelullo appropriated them. Pelullo was the one person in his web of companies who knew on a daily basis where every dollar lay. Even apart from such testimony it is inconceivable that he did not know on December 1 that Corona had executed his instruction that the UNUM contract be terminated and that the proceeds had found their way into the 174 account. He was not a man who could misplace a million dollars here and a million dollars there.

Pelullo had immediate need of the proceeds of the UNUM contract. The manner in which its source was disguised and the uses to which the proceeds were put are

reflected in Exhibits G3000, G3100 and G3200.

At that time Pelullo was seeking to acquire National Media a so-called "infomercial company" which had $10 million in cash. The purchase was to be effected through Moshe Milstein, because the owner of National Media shares, Abe Solomon, would not wish to do business with Pelullo.

Media Group I, Inc., was established as the general partner to facilitate the project. It had its office at Pelullo's office in Miami. Limited partners included Webb Press(a Pelullo company), LRP Corp. (another Pelullo company), and GH Enterprises (a company owned by Hellhake's father). Web Press was responsible for putting up $1.29 million in cash towards the acquisition of the National Media shares. Exhibits G3000, G3100 and G3200 reflect the manner in which the proceeds of the Retirement Fund's UNUM contract were applied to advance Pelullo's quest for National Media.

On December 1, 1989, the day after the UNUM contract proceeds were deposited in the 174 account, $1,000,000 was transferred to an Equity Finance Group account and immediately wired to an Adorno, Zeder, Allen account in Miami. From the Adorno, Zeder, Allen account $100,000 was paid to Nursery Acquisition Corp. (a Pelullo company engaged in another Pelullo acquisition for which $100,000 was required to obtain an extension of a closing date). On December 4 Adorno, Zeder, Allen wired $900,000 back to the 174 account at the Summit Bank. On December 7, the $900,000 passed through an Equity Finance Group account, a Web Press, Inc. account, a Media Partners, Inc. account, and finally still on the same day into a Wilentz, Goldman & Spitzer trust account. That firm was handling the National Media transaction for Media Partners.

The National Media acquisition did not close (Solomon had learned of Pelullo's involvement) and, as was the case in so many of Pelullo's ventures, litigation ensued. Pelullo informed Hellhake that the UNUM funds would have to be used to finance that litigation and would be paid back upon the acquisition of National Media. The manner in which the $900,000 and other funds trans-

ferred to the Wilentz, Goldman & Spitzer trust account were transmitted to a variety of Pelullo companies and other interests is set forth in Exhibit G3200.

When $1 million of UNUM contract funds was transferred out of the 174 account on December 1, 1989, $400,000 of UNUM contract funds remained in that account. Exhibit G3100 reflects that $2,245 was used to cover an overdraft on the account and the balance was used for a multitude of Petullo corporate and personal purposes.

As a result of the civil litigation which Gerardi and Marqueen instituted in the federal court, Summit Trust Company was appointed trustee of the Employees Benefit Plans. It faced the daunting task of marshaling assets. The evidence at the trial of the criminal case disclosed the road blocks which Hellhake and Pelullo created to prevent Summit Trust from learning the true facts. In particular they made false claims against the bank and lied about the UNUM contract proceeds.

Ultimately the National Media lawsuit was settled for $2 million, and of that sum $1.4 was paid to the Employees Benefit Plans—a part, but only a part, of the enormous sums which Pelullo and his underlings embezzled from these plans.

### III. *Discussion*

A. *Sufficiency of the Evidence:* Pelullo contends that there was insufficient evidence to prove an embezzlement or a conspiracy. I suppose defense counsel must raise every conceivable argument, but this contention borders on the frivolous.

■ Pelullo's method of operation was to conduct his multitudinous business and personal transactions through a host of corporate and partnership entities and through a dizzying succession of wire transfers, both necessary and unnecessary to accomplish an objective. As a result Pelullo was able to conceal the nature of his undertakings and deceive those with whom he was dealing, not only the Employees Benefit Plans which are the subject of this case, but also others who did business with him. All of this activity generated mountains of documents, as dis-

closed by the search of the Miami warehouse. No one but Pelullo could comprehend it all in its entirety. He alone, an obviously highly intelligent person, was able to keep track of it all and manipulate it to his advantage.

Through what most have been extraordinary effort and perseverance special Agent Rosario Ruffino and the Assistant United States attorneys assigned to this case were able to extract from the mountain of records those which reflected the embezzlement and disposition of Employees Benefit Plan assets and to prepare charts which make comprehensible the transactions which took place. That evidence together with the undisputed testimony that Pelullo controlled every significant decision either directly or through his minions or through persons he deceived, establishes that the embezzlements charged in the indictment took place and that Pelullo was the person previously responsible for them.

The fact that Marqueen authorized the $750,000 "loans" to Granada is not determinative. The fact is, as described above, Pelullo had instructed Hellhake to misrepresent and conceal the true circumstances when he persuaded Gerardi and Marqueen to authorize the payment to Granada.

The fact that Corona and Hellhake (two of Pelullo's closest confederates) authorized the "loan" to ATTS does not absolve Pelullo. It is further proof that having removed Gerardi and Marqueen, he through his minions was raiding the Employees Benefit Plans.

Pelullo offers no reason why the use of the UNUM contract funds was not an embezzlement except to argue that on December 1, 1989 when $1,000,000 was wired to an Equity Finance Group account he did not know it was the proceeds of the UNUM contract. His lack of knowledge is inconceivable given his absolute control and daily monitoring of all his companies' bank accounts. Further, his knowledge was evidenced by the testimony of Hellhake, Manny Ferro, Janice Larson, Bonnie Lynn, Angela Malgeri and of his own witness Frank Agostino.

The evidence of embezzlement from the Retirement Plan and the Thrift Plan is overwhelming.

■ Similarly that is overwhelming evidence of a conspiracy between Pelullo and Hellhake and Corona to embezzle pension monies. The roles of Hellhake and Corona are described in the review of the evidence set forth above. Others may also have been involved in the conspiracy, but is in unnecessary to address that question here.

B. *Money Laundering Counts:* Counts 13–54 charge Pelullo with money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and § 1956(a)(1)(B)(i). The statute provides:

(a) (1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity -

(A) (i) with the intent to promote the carrying on of specified unlawful activity; or

(B) (i) knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity

has committed money laundering.

The government charges in Counts 13–16 that money transferred by Granada and from the Compton Press 174 account after the Granada–DWG loans were funded constitute money laundering. Counts 17–40 charge that money transferred by Adorno after the ATTS loans were funded constitute money laundering. Counts 41–54 charge that transfers by the Compton operating account (a non-pension fund account) after the UNUM annuity was deposited, constitute money laundering. (See Exhibits G1000, G2200, G3000 and G3100).

The government is required to show (1) that Pelullo knowingly engaged in a financial transaction involving the proceeds of specified unlawful activity; (2) that he knew that the money involved in the financial transaction represented the proceeds of some form of unlawful activity, and (3) that he engaged in the financial transaction with either the intent to promote the specified unlawful ac-

tivity or knowledge that the financial transaction was designed, in whole or part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the specified unlawful activity.

■ The indictment charged that the specified unlawful activity was a violation of 18 U.S.C. § 664, prohibiting the embezzlement, abstraction, conversion, or theft of pension funds covered by ERISA. Giving the government the benefit of all favorable inferences, which I am required to do, the government has adduced sufficient evidence with respect to the charged money laundering offenses.

Relying on *U.S. v. Paramo*, 998 F.2d 1212 (3d Cir.1993), *cert. denied*, 510 U.S. 1121, 114 S.Ct. 1076, 127 L.Ed.2d 393 (1994), Pelullo argues that "[t]he subsequent transfers from Granada, Adorno and the Compton accounts did not 'promote the carrying on' of a violation of § 664 (the only alleged specified unlawful activity) in contravention of 18 U.S.C. § 1956(a)(1)(A)(i)". He further argues that, assuming the initial diversions of the pension fund assets violated § 664, "the value created by the § 664 violation, and then the money laundering, occurred when the money was taken and transferred to Granada, Adorno and the Compton accounts", not when subsequent transfers were made from Granada, Adorno and the Compton accounts.

I conclude that Pelullo's argument misapplies *Paramo* and does not reflect the evidence in this case. According to Pelullo's line of reasoning the act constituting the § 664 embezzlement and the act constituting the money laundering are one and the same, and failure to charge that the acts of embezzlement constituted money laundering requires dismissal of the money laundering counts.

In *Paramo*, Vega, an IRS tax examiner, mailed (to Paramo) tax refund checks payable to fictitious payees. In order that the checks could be cashed, Paramo mailed them to his brother, who deposited them in a bank account, drew out the funds from the account and divided the funds among the three participants in the mail fraud scheme. The money laundering charges were based upon the cashing of the embezzled checks. Para-

mo contended on the appeal from his conviction that cashing the checks was not done with the intent to promote the carrying on of the mail fraud, because the undisputed evidence established that he used the proceeds solely for personal items and not to advance the mail fraud scheme.

The Court of Appeals rejected this line of reasoning. It noted that the underlying unlawful activity, mail fraud, "was legally completed as soon as the check in question was mailed to a fictitious payee in New York City." 998 F.2d at 1217. Nevertheless it held that the jury could find that the subsequent cashing of the checks was done with an intent to carry on the mail fraud because cashing the checks was necessary to realize a benefit from the mail fraud.

Similarly in the present case, even if the embezzlements were completed when pension funds were transferred to the Granada, Adorno and Compton Press operating accounts, it was necessary to consummate additional financial transactions in order to realize a benefit from the § 664 embezzlements.

The various cases which Pelullo cites do not have the effect of narrowing the reach of § 1956(a)(1)(A)(i). Rather they describe certain transactions which are within its provisions, such as the transactions covered by Counts 13–55, without limiting the provisions to those particular transactions, *Paramo, supra; U.S. v. Jackson*, 935 F.2d 832 (7th Cir.1991); *U.S. v. Montoya*, 945 F.2d 1068 (9th Cir.1991). There is evidence on the basis of which a jury could find a violation of § 1956(a)(1)(A)(i).

Pelullo also urges that the alleged money laundering transactions were not designed to conceal the notice, source, ownership or control of the funds in violation of § 1956(a)(a)(B)(i). The government does not contend that all of the money laundering counts were designed to conceal or disguise. To establish concealment or disguise, the evidence must, of course, establish the requisite knowledge and intent on Pelullo's part. Certain of the transfers out of the Granada, Adorno and Compton Operating accounts do not at first blush have any obvious business purpose and a jury might well conclude in

the light of all the evidence that they were designed to conceal or disguise the nature, source, ownership or control of the embezzled funds. There is evidence on the basis of which the jury could have found at least on some of Counts 13–54 that there was a § 1956(a)(1)(B)(i) violation.

I have reviewed the other grounds which Pelullo advances to support his motion to dismiss the money laundering counts, namely: i) insufficient evidence that he knew that the moneys used were the proceeds of unlawful activity; ii) failure of proof of underlying § 664 violations with respect to the money transferred out of the Granada and Adorno accounts, and iii) failure to prove that Pelullo knew at the time he transferred the $1,000,-000 proceeds of the UNUM contract that it was pension money. I have addressed and rejected these contentions in the preceding section of this opinion.

C. *Brady, Giglio, Jencks Material:* One of the problems in this case is the almost inexhaustible body of materials which relates to it. There is the mountain of records which Pelullo and his companies generated and which is described above. There are the documents and transcripts of testimony which were created in the DWG Corp., National Media and Gerardi–Marqueen civil cases. There are the grand jury investigations and criminal trials conducted in the state court in Florida, the Middle District of Florida and the Eastern District of Pennsylvania. Countless individuals who dealt with Pelullo and his companies gave interviews, testified, provided statements and affidavits in one or more of these proceedings on one or more occasions during the past ten years.

As a practical matter no one, either prosecutor or defense counsel, can ever expect to get all of this material under control. There will always be something more which can arguably be relevant to the issues in this case. Before, during and after the trial both the government and defense counsel in this case have repeatedly discovered additional materials of this nature. The delay in discovery was not from lack of diligence but because there is so much out there. In his motion for a judgment of acquittal or for a new trial Pelullo has marshaled material of

this nature discovered after trial which he contends constitutes *Brady, Giglio* and Jencks material. If it is, then it must be determined what consequences flow from failure of the government to disclose it.

1. *Interview of Witnesses:* Pelullo's first observation is that the government met and interviewed all key witnesses (Andrew Heine, Jan Larson, Bonnie Lynn, Fred Schwartz, David Neifeld) and also potential witnesses who did not testify (Barbara McGlynn, Jacob Der Hagopian, Don Holman and Raul Corona). However, according to Pelullo, "the government did not disclose all *Brady* and *Giglio* material, or the material required under 18 U.S.C. § 3500 (hereinafter "Jencks"). (Pelullo Brief at 5).

■ The government had no obligation to provide Jencks material with respect to persons who did not testify. An order had been entered in this case requiring that all Jencks and *Giglio* material be provided to Pelullo on the day prior to trial. Three days prior to the date originally scheduled for commencement of trial the government turned over all Jencks and *Giglio* material then in the possession of the U.S. Attorney's office in this district. This material included more than 150 items concerning 32 prospective government witnesses. On September 24, 1996, one day before the actual commencement of trial, the government produced additional Jencks material, which was supplemented from time to time during the trial as it came to the government's attention. As will be mentioned below, there were later discovered items which might be considered Jencks and *Giglio* material which were not in the possession of the U.S. Attorney's Office in this district and which were not turned over to the defense.

It does not follow from the fact that witnesses and potential witnesses were interviewed that *Brady, Giglio* and Jencks material was generated. The government is not required to turn over to a defendant its rough notes of interviews unless they disclose *Brady* material or constitute *Giglio* or Jencks material. There is no reason to question the government's contention that it has disclosed material of that nature in the pos-

session of the U.S. Attorney's Office in New Jersey.

2. *Heine Materials:* After the trial in this case defense counsel discovered various materials relating to Andrew Heine which they assert should have been disclosed by the government either as *Brady* or *Giglio* or Jencks material. To view this material in perspective it is necessary to examine Heine's role in the trial.

Heine's testimony related primarily to the Granada–DWG Corp. embezzlement. Quite simply, the Granada "loans" were the transfer of funds from the Employees Benefit Plans in the first instance to Granada Investments, Inc. The funds were then expended to implement Pelullo's acquisition of DWG Corp. and for other Pelullo purposes. The actual embezzlement was accomplished by Pelullo directing Hellhake to persuade Gerardi and Marqueen through false representations and non-disclosure to authorize a $750,000 loan to Granada Investments, Inc. and by Pelullo directing that an additional $400,000 be paid to Granada Investments, Inc. without Gerardi's and Marqueen's knowledge.

Although Pelullo had discussed with Heine the possibility of borrowing from the Compton Press Employees Benefit Plans, Heine had nothing to do with the actual thefts. His involvement was well after the fact when Pelullo sought to create the appearance of a legitimate investment by providing the Employees Benefit Plans with three notes—a $150,000 note and a $600,000 note to cover the $750,000 payment and a $400,000 note to cover the $400,000 payment. This was to give reassurance to Gerardi and Marqueen who had finally woken up and were demanding explanations of the transactions. Pelullo asked Heine to sign these notes. Before discussing the *opera bouffe* which these notes engendered during the trial, a summary of Heine's testimony might help.

Heine had been a social friend, lawyer, and business associate of Pelullo for many years. He not only gave him legal advice from time to time, he also participated with him in a number of business ventures and investments. Although an associate or partner in various law firms, Heine was more investor then attorney. He was acquainted with many of Pelullo's associates and underlings and had knowledge of his various corporations. He gave extensive testimony about various of Pelullo's associations and business transactions.

Heine actively participated in the DWG Corp. takeover. Pelullo was to provide the financing and Heine was to be the front man, dealing with the investment bankers and press. When the takeover became hostile, Heine was familiar with the law suit which Granada instituted against DWG Corp. and Victor Posner. He was aware of Pelullo's purchases of substantial amounts of DWG Corp. stock, of borrowing from a bank to finance the purchase, and of the existence of margin arrangements with brokerage houses.

Pelullo discussed with Heine the possibility of borrowing from the Compton Press Employees Benefit Plans, and Heine questioned the legality of such a transaction.

Heine testified that in late July or August 1989 Pelullo asked him to sign a $400,000 note payable to one or another of the Employees Benefit Plans, which, with some reluctance, he did. Thereafter, according to Heine, Pelullo presented him with additional notes totaling $750,000 and asked him to sign them. In his direct examination Heine testified that he did not sign the proffered $600,000 and $150,000 notes. Shown the note documents he stated that the signatures on them were not his.

On cross-examination Heine was shown answers to interrogatories which he had signed in the DWG Corp. litigation which appeared to vouch for the genuineness of the $600,000 and $150,000 notes. Both on his direct and cross-examination David Hellhake testified that he believed that Heine had signed the $600,000 and the $150,000 notes. He also testified that in 1990 when searching for the notes in Pelullo's Miami office they found a copy of the signed $600,000 note but that a copy of Heine's signature had to be superimposed on the copy of the $150,000 note.

Bonnie Lynn held a number of titular positions in Pelullo's companies and worked in his Miami office. She testified about a 1990 search for the notes, stating that Corona told her that he and Hellhake had signed Heine's

name to them, lifting his signature from another document using a copy machine.

There was testimony of other witnesses concerning the issue of Heine's signature on the notes—all of it utterly immaterial to the issue of Pelullo's guilt or innocence. By the time Heine was asked to sign the notes the theft of $1,150,000 from the Retirement Plan had long since been accomplished. The relevant fact was that when Gerardi and Marqueen demanded explanations for the money transfers Pelullo sought to create documentation to disguise them as loans. Whether the disguises bore the genuine or forged signature of Heine makes no difference.

■ Pelullo argues that the government was aware that Heine signed the notes and therefore relied on false testimony. This is incorrect. The government produced and questioned witnesses whose recollections differed from Heine's and who testified to facts from which it could be argued that Heine signed the notes. The government informed the jury that it would have to decide whether Heine signed the notes; it also informed the jury, correctly, that insofar as Pelullo's guilt or innocence was concerned it made no difference whether or not the notes bore Heine's valid signature. The information which Pelullo asserts is exculpatory and thus Brady material is not exculpatory, e.g., Hellhake's belief Heine signed the notes, Hagopian's opinion that the notes were valid obligations of Heine, differing recollections about the search for the notes in Pelullo's office. For whatever relevance it had defendant was in a position to and did cross-examine the witnesses concerning these events and their differing recollections.

While the trial was proceeding in this case Heine and the government were engaged in a forfeiture action arising out of Pelullo's conviction in the Eastern District of Pennsylvania criminal action. Heine had filed a petition to adjudicate his interest in property which the government sought to forfeit. His deposition was taken in that proceeding on March 4, 1996. He testified in that proceeding on September 26, 1996, immediately prior to testifying in the instant case. At the conclusion of the forfeiture trial the court in that case sealed the record.

Pelullo contends that these papers should have been provided to him as they contained *Brady* and *Giglio* material. The U.S. Attorney's office in New Jersey was not a participant in the proceeding.

I have read the 240 page deposition transcript. It relates to Heine's claim to Montana land and the Brickel property located in Florida in which Heine and Granada received an interest as a part of the settlement of the civil action which Gerardi and Marqueen brought in the federal district court. There was testimony concerning the Granada action against DWG Corp.; there was testimony concerning the Granada–Marqueen action and the settlement thereof. At the time the deposition was taken Heine was representing Pelullo in connection with a number of business matters. There was only the most casual reference to the payments by the Retirement Plan to Granada—nothing that would constitute *Brady, Giglio* or Jencks material.

I have also read the transcript of Heine's testimony at the forfeiture proceeding. He described the settlement process in the Gerardi–Marqueen civil action. In October 1994 he and Pelullo agreed to pay the Employees Benefit Plans $1,150,000. Pelullo was unable to come up with his $400,000 share. Thereupon Heine agreed to pay the $400,000 in exchange for an option to acquire mortgages which the Employee Benefit Plans held on the Brickel Avenue property in Florida and the Montana property. The government sought to forfeit these properties on account of Pelullo's fraud. The properties were owned by corporations affiliated with Pelullo and had been pledged to the Compton Press Employees Benefit Plans to secure Pelullo's obligation to the Plans. It was the government's position that the properties were subject to the Pelullo forfeiture and that the Plans had nothing to convey to Heine.

In addition at the forfeiture trial the government played tape recordings of a number of conversations Heine had with Pelullo, who was in prison, during the February–June 1995 period. Pertinent portions of these conversations are summarized in Judge Kelly's October 26, 1996 opinion denying Heine's petition in the forfeiture proceeding. Heine

and Pelullo were engaged in continuing discussions concerning the Montana and Brickel Avenue properties. Heine had agreed to share any proceeds he received with Pelullo or his family. Judge Kelly found that: "The tape recorded conversations introduced by the government clearly establish the existence of a conspiracy between Heine, Pelullo and Pelullo's father to defeat the government's forfeiture interest in the forfeited properties so that Heine, Pelullo and Pelullo's father could share in the proceeds of the forfeited properties." (Op. at p. 19)

Judge Kelly sealed the transcripts of the September 26, 1996 forfeiture hearing. They did not come into the possession of the New Jersey U.S. Attorney's Office. They related to events which took place long after the events which are the subject of the instant case. The evidence could only have put Pelullo in a more unfavorable light. It did not constitute *Brady*, *Giglio* or Jencks material.

 3. *UNUM Contract Witnesses:* Pelullo seeks to hide behind the confusion which arose out of the bank account mix-up which occurred during the embezzlement of the UNUM contract funds. The simple facts of the matter are that Pelullo needed those funds to implement his National Media acquisition. He directed Corona to liquidate the UNUM contract. Corona liquidated the contract. The sum of $1,400,000 was paid on account of the contract and Pelullo spent it to implement his attempted purchase of National Media and for other of his personal and business purchases.

A number of individuals were involved in the mistaken deposit and in communications about it among themselves and with Pelullo. Corona made arrangements with Summit Trust Company to open the new account but failed to return the papers so that the account would be opened before the funds arrived. Karen Degner was the Summit Trust Officer who handled the Compton press accounts and who gave Corona the documents required to open the new account. Jan Koenig was a Summit Trust employee who worked in the wire transfer department. When the UNUM contract proceeds came into the bank for deposit in the non-existent 271 account she conferred with Degner and

deposited it in the 174 account with the understanding that Degner would confer with the customer and call back if there were a problem. Advice of the deposit was wired to Pelullo's Miami office. Janice Larson, an employee in Pelullo's Miami office, telephoned Summit Trust each day to obtain the bank account balances and gave the information to Pelullo. On December 1 she learned of the November 30 $1.4 million deposit and informed Pelullo, who directed her to move it to the Adorno, Zeder trust account via Equity Insurance Group. Bonnie Lynn, who had been temporarily assigned to the ATTS offices by Pelullo, appeared on December 1 at Pelullo's Miami office on his instructions. She ran into Janet Larson who informed her of the unexpected $1.4 million in the 174 account, and the two speculated about it being pension fund money. Bonnie Lynn also reported that Pelullo informed her that he had raised his portion of the funds to do the National Media deal. She did not ask him where it came from. Hellhake testified that he informed Pelullo on December 1 (after the money had come in but after $1 million of the $1.4 million had been transferred out) that the $1.4 million was from the UNUM annuity contract. The testimony of these people tended to confirm what was readily apparent from the circumstances and documents, namely that Pelullo was appropriating the UNUM contract proceeds for his own purpose.

Pelullo contends that because the government failed to advise him of snippets of information it received from various of these individual it violated it *Brady* obligations and prevented him from effectively cross-examining witnesses. This contention is totally without merit. Whatever minor inconsistencies there may have been in their recollections of events could have had no effect on the testimony. Most of these persons testified and Pelullo had a full opportunity to examine into and compare their recollections. Overall there was a remarkable consistency in the recollections of these witnesses when one considers that seven years had elapsed since the events took place.

 4. *Gerardi, Marqueen and Derrick Loans:* In his most recent submission Pelullo

asserts that in his continuing review of records he "has uncovered additional powerful exculpatory impeachment evidence the government failed to disclose", namely, the fact that in December 1984 Gerardi, Marqueen and Derrick approved a loan from the Employees Benefit Funds to C.P.I. Realty, a company in which these three trustees of the funds owned a 100% stock interest. Even more damning, according to Pelullo, Gerardi, Marqueen and Derrick received a favorable legal opinion and cleared the transaction with the Department of Labor. How then, questions Pelullo, can the government characterize Pelullo's self-dealing as criminal?

Little space need be devoted to this contention of Pelullo. In the first place, if a loan of a prior trustee were improper or criminal, that would not excuse improper or criminal conduct of a successor trustee. Secondly, and more to the point, there is nothing to suggest that the Gerardi, Marqueen and Derrick loan bore any resemblance to the loan transactions described in the beginning of this opinion.

5. *Other Brady, Giglio, and Jencks Contentions:* Pelullo has designated a number of other items which he asserts constitute *Brady, Giglio* or Jencks violations. Most are totally inconsequential in nature. The U.S. Attorney's Office in the district was unaware of much of it, which is understandable in view of the sea of documents which Pelullo and his litigation leave in their wake. Some of it might be considered *Giglio* or Jencks material. Much of it was within Pelullo's knowledge or readily available to him. He more than any other single person has the greatest command of all relevant documentation.

Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) "the suppression by the prosecution of evidence favorable to an accused upon request violates due process when the evidence is material either to guilt or to punishment" at 87, 83 S.Ct. at 1196–97. As to "materiality":

*Bagley's [United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)] touchstone of materiality is a "reasonable probability" of different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).

■ Pelullo was provided with all immunity and/or proffer agreements from the District of New Jersey for all potential witnesses that were interviewed, whether or not they testified. Pelullo asserts that certain witnesses were accorded immunity in other districts or jurisdictions of which he was not informed. Despite Pelullo's suspicions, he has not established and the government is not aware of other agreements made with Hellhake.

Neifeld's use immunity was developed during his direct examination. After the trial it was learned that he had received a letter in the Middle District of Florida to the effect that he was not the target of a grand jury investigation there and would not be prosecuted for truthful testimony. The letter agreement could not be located. In the present case defense counsel did not pursue with Neifeld his New Jersey use immunity and it is unlikely that knowledge of the Middle District letter would have affected cross-examination or his testimony in any way.

The government provided defense counsel with the two Janice Larson proffer agreements with the New Jersey U.S. Attorney's Office. The government also provided defense counsel with a transcript of Larson's testimony before a grand jury in the Eastern District given pursuant to a court ordered grant of immunity. The grand jury transcript referred to the grant of immunity and a separate "informal letter of immunity." Defense counsel did not cross-examine Larson at all concerning her various grants of immunity, and absence of the actual letter referred to in the grand jury transcript was of no consequence.

Similarly, defense counsel was provided with a transcript of testimony which Heine gave before the grand jury in the Middle District of Florida on July 7, 1993. This

758

testimony refers to the letter granting him immunity, providing defense counsel with whatever information he needed to conduct cross-examination on that subject or to request the actual letter if he thought it would be useful.

Bonnie Lynn did not testify before the grand jury in the Middle District of Florida, although she may have received a proffer letter from an Assistant U.S. Attorney working on the Florida "PIE" investigation. Defense counsel were provided full information concerning Lynn's proffer agreements in the District of New Jersey and her immunity agreement in the Eastern District of Pennsylvania. The lack of a proffer letter from the Middle District of Florida was of no moment. Hagopian did not testify in the present case and therefore the government had no obligation to turn over to defense counsel his immunity letter.

Even if all the material which Pelullo designates as *Brady* or *Giglio* material were handed to him months before trial there is not the slightest likelihood that the verdict would have been affected in any way. The evidence was overwhelming. The only chance that Pelullo had of prevailing was that the jury would get lost in the maze of transactions and documentation. The post-trial motion continues the practice of burying simple issues in mountains of documents.

■ Under the Jencks Act, a court must analyze the prejudice resulting from the nondisclosure of grand jury testimony or other statements in terms of their usefulness to the defense. This is a more exacting standard than the materiality standard imposed under *Brady*. *United States v. Hill,* 976 F.2d 132, 141 (3d Cir.1992).

Notes which are not a "substantially verbatim recital" made contemporaneously with the making of the oral statement are not Jencks material. 18 U.S.C. § 3500(e)(2).

The government turned over to defense counsel the extensive Jencks material and much other material generated in the investigation of this case.

The grand jury testimony of Sam Kastner in the Middle District of Florida, which concerned the unrelated "PIE" investigation, was not Jencks material because Kastner did not testify in this case.

■ Although many notes of interviews and FBI 302 reports were voluntarily provided to defense counsel, such notes and reports when not a substantially verbatim recital made contemporaneously with the making of oral statements are not Jencks material. The government had no obligation to provide such notes and reports prepared in this district or in any other district.

Whatever testimony Hellhake and Larson gave before a state grand jury in Florida was material in the possession of a state agency and, unless obtained by the federal government, not within the reach of the Jencks Act. Since the Florida investigation concerned an unrelated matter there is no reason why the U.S. Attorneys Office in Miami would have obtained transcripts.

■ The government did not provide to defense counsel transcripts of Larson and Neifeld testimony before the grand jury in the Middle District of Florida. As has been noted above the Middle District was investigating Pelullo for criminal activity different from the Compton Press charges. In 1995 the U.S. Attorney's office in New Jersey requested of the U.S. Attorney's Office in the Middle District all potential Jencks material. The Office the Middle District provided substantial amounts of materials, but the Larson and Neifeld transcripts were not included. They were not located until after the conclusion of the trial in this case.

If this be considered a violation of the Jencks Act it was harmless error. Under the Jencks Act, the Court must analyze the prejudice resulting from the non-disclosure of the grand jury testimony in terms of its potential usefulness to the defense, which is a more exacting standard than the "materiality" standard pursuant to *Brady*. *United States v. Hill, supra,* 976 F.2d at 141, *citing United States v. Beasley,* 576 F.2d 626, 630 (5th Cir.1978), *cert. denied* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979).

The only testimony which Lynn or Neifeld gave in the Middle District which would have any bearing on the present case was a gener-

al description of their relationship with Pelullo. Lynn describes her employment relationship with Pelullo and her duties in a manner completely consistent with her testimony in the present case. The Middle District testimony did not touch upon the events which are significant in the present case. Neifeld describes how he met Pelullo and worked with him as a consultant. No mention was made of Compton Press, DWG Corp., Granada, ATTS or National Media about which he testified in the present case. Under the circumstances of this case it is questionable if the government violated its Jencks obligations. However, if it did it was harmless error as Pelullo suffered no prejudice.

D. *Miscellaneous Contentions:* Pelullo advances a number of other grounds to support his motion for a judgment of acquittal. For the reasons set forth below, none of them have merit.

1. *Hearsay Evidence:* Pelullo contends that the government improperly introduced three statements as coconspirator statements under Fed. R.Evid. 801(d)(2)(E). The statements that Pelullo challenges are: 1) Bonnie Lynn's testimony that Andrew Heine told her that he did not sign one of the notes between Granada Investment, Inc. and the Compton Press pension funds (T. at 1468); 2) Lynn's testimony that, in early December 1989, Janice Larson advised her that "an extra million four showed up in one of our bank accounts" (T. at 1483); and 3) David Hellhake's testimony that on the morning after $1.4 million was deposited into the Compton Press Operating Account at Summit Trust, Barbara McGlynn "said to be on the lookout for the UNUM money because it was due in any day." (T. at 2286).

■ No objection was made to this testimony at the time it was given. As to Bonnie Lynn's testimony that Heine told her that he did not sign one of the Granada notes, Pelullo had repeatedly challenged the truthfulness of Heine's trial testimony that he had not signed the notes aggregating $750,000, although he had signed the $400,000 note. Heine was subject to cross-examination. Lynn's testimony was consistent with his allegedly recent fabrication. Thus it was admissible under Fed.R.Evid. 801(d)(1)(B).

■ The other two statements were not hearsay in that they were not offered to prove the truth of the fact that $1.4 million had been deposited in a Compton Press account. That fact was established by other means and was never disputed. Rather the two statements were offered to show what it was that caused Lynn and Hellhake to take subsequent actions.

2. *Attorney-Client Privilege:* At the trial Heine testified concerning legal advice which he had received from the law firm of Curtis, Mallet concerning Granada Investments and Compton Press Employees Benefit Plans. Pelullo contends that this testimony violated his attorney-client privilege.

■ There is no merit to this contention. There was no showing that the law firm was representing Pelullo personally. Heine was entitled to testify about his own consultations with Jeffrey Mamorsky, Esq., of the Curtis, Mallet firm concerning the possibility of investing Employees Benefit Plan funds in Granada. There was no testimony about any communications between Pelullo and Mamorsky. If Pelullo had a privilege he waived it when, in the Gerardi–Marqueen civil action he informed Judge Ackerman in open court about the substance of his conversations with Mamorsky of Curtis, Mallet.

■ 3. *Rule 404(b) Evidence:* Evidence was introduced of Pelullo's purchase and disposition of DWG Corp. stock acquired with Compton Press Employees Benefit Plan funds. These transactions were not charged as criminal acts in the indictment. However, Pelullo's dealings with the 19,900 shares of DWG Corp. stock in question were an integral part of his over-all use of pension funds to acquire control of DWG Corp. The evidence goes to plan, intent, motive. It was highly relevant and in no way prejudicial in nature. It could not have inflamed the passions of the jury or led the jury into irrelevant areas. The evidence was proper.

■ 4. *Jury Charges:* Pelullo asserts that ERISA fiduciary principles were improperly interjected into the trial both in the testimony and in the jury charge. The jury was instructed that a violation of fiduciary

duties to a pension fund is insufficient to support a criminal violation of § 664 and that "to find a criminal violation, you must find that the defendant knew he was receiving money to which he was not entitled, and knowing this, he wilfully and deliberately appropriated the money for his own use." (T. at 3218). The jury was further instructed on wilfulness and intent. To rebut Pelullo's contention that he lacked requisite criminal intent and that the transactions at issue were legitimate loans or the product of mistake, the government was entitled to show Pelullo's fiduciary duties and his knowledge of his responsibilities as a fiduciary. *United States v. Snyder,* 668 F.2d 686 (2nd Cir.1982), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982).

Neither the evidence, the government's closing argument nor the jury charge concerning ERISA obligations created confusion or doubt about the elements which the government had to prove to convict Pelullo.

■ 5. *Statute of Limitations:* Pelullo and his counsel executed four separate affirmations extending the statute of limitations period through December 20, 1989. The extensions referred to "violations of federal law in the District of New Jersey relating to matters involving Compton Press, Inc." It is Pelullo's contention that Compton Press is an entity separate from the Employees Benefit Plans and therefore the charges in the indictment which all relate to the Plans were not within the language of the waiver.

The contention is untenable The Compton Press Plans are certainly "matters involving Compton Press, Inc." When the waivers were entered into the subject of inquiry was Pelullo's dealings with the Compton Press Employees Benefit Plans. It would be a distortion of the language of the waiver and of the clear intention of the parties to find that the limitations period was not waived in this case.

6. *Prosecutorial Misconduct:* I have reviewed and find without merit Pelullo's contention that prosecutorial errors during closing and rebuttal arguments require a new trial. These contentions are: i) The government improperly commented on Pelullo's failure to testify. ii) The government improperly attacked the integrity of Pelullo's counsel. iii) The government mischaracterized the evidence. iv) The government vouched for the credibility of one of its witnesses.

■ 7. *Refusal to Grant Continuance:* The court throughout pretrial proceedings repeatedly granted Pelullo's requests for continuances. The final request which was granted was preceded by Pelullo's solemn assurance that he would not seek a further adjournment. In May 1996 he had sought to obtain the services of the law firm of Howrey & Simon and stated "Should the Court [grant the requested continuance to obtain new counsel] I will agree and stipulate that I will not seek any further adjournment regardless of whether I retain Howrey and Simon to defend me in this case." I granted the adjournment and scheduled the trial for September 10. The timing was important for court administrative purposes, because another lengthy criminal trial was scheduled to commence before me immediately after the Pelullo trial. In view of the expected length of the trial a large panel of jurors was screened long in advance for potential inability to serve. They had been informed that the trial period would extend from September 10 for a month or so.

In September, defendant expressed dissatisfaction with his able court appointed attorney and asked for another adjournment to allow Herbert Beigel, Esq., of the law firm of Beigel, Lasky, Rifkind, Pertrik, Gelber & White to represent him. Mr. Beigel had represented Pelullo and/or certain of his companies in civil matters.

It was unclear why Pelullo believed that his court-appointed attorney could not proceed with the trial. Nevertheless, I permitted the substitution of Mr. Beigel but asked that court-appointed counsel remain as co-counsel for as long as Pelullo and Mr. Beigel thought he could be helpful. Further, although I required that the jury be selected on schedule so as not to run the risk of losing potential jurors, I acceded to Mr. Beigel's request that the substantive part of the case not commence until September 24 or 25. I also noted that because of other court de-

mands there would be a number of days during the trial when the case would recess.

After the two week recess following jury selection the trial proceeded. Mr. Beigel exhibited total command of the facts and the law and no one could have provided Pelullo with a more effective defense. Refusal to grant Pelullo a longer adjournment was an appropriate exercise of discretion.

8. *Forfeiture:* Pelullo challenges the failure to instruct the jury that the amount of the forfeiture should be reduced by the amount of money that the pension funds were able to recoup as a result of the civil litigation. The forfeiture statute, 18 U.S.C. § 982, provides that "the court in imposing sentence on a person convicted of an offense in violation of— section 1956, shall order that the person forfeit to the United States any property, real or personal, involved in such offense." Unlike statutory restitution provisions, the forfeiture statute makes no provision for a set-off by reason of the victim's recovery. There was no error in the jury charge.

### IV. *Conclusion*

For the reasons set forth above Pelullo's motion for a judgment of acquittal or for a new trial will be denied. I shall prepare and file an appropriate order.

**762**

GOVERNMENT EXHIBIT 1000

# EMPLOYEE THRIFT PLAN STOCK/PROCEEDS
## 19,900 SHARES OF DWG
### TRANSFER/SALE/DISTRIBUTION

# INITIAL INVESTMENTS - AWAY TO TRAVEL SOUTH (A.T.T.S.) $960,000

$g 2300$

JACK LAWRENCE
8/30/89 Wire
8/30 $100,000

MURRAY SCHWARTZ
9/1/89 Wire
9/1 $100,000

ROBERT WASKOVER
9/14/89 Wire
(9/1/89 Check Reversed)
9/14 $50,000

COMPTON PRESS, INC.
A.G. EDWARDS
Corporate A/C 446000403
9/1/89 Wire
9/1 $100,000

OLYMPIA ACQUISITION
A.G. EDWARDS
A/C # 446000586 001
9/1/89 & 9/5/89 Wires
9/1 $154,000
9/5 $332,000

OLYMPIA ACQUISITION
SUMMIT TRUST CO.
A/C # 28-028300239
9/1/89 Check #1008
9/1 $10,000

EQUITY FINANCE GROUP
SUMMIT TRUST CO.
A/C # 28-028300182
9/1/89 Wire
9/1 $115,000

TOTAL $961,000

ADORNO TRUST ACCOUNT
BARNETT BANK
ACCOUNT # 1595225315
FRED SCHWARTZ, TRUSTEE

TOTAL RECEIVED
$961,000

9/11/89 Check #1805
$650,000

9/11/89 Check #1806
$300,000

9/11/89 Cashiers Check
#G093401
$10,000

JEFFREY BECK
BANKRUPTCY EXAMINER

TOTAL RECEIVED
$960,000

Away to Travel South (A.T.T.S). - Transfer of $1,326,000. Pension Funds Sept.-Oct. 1989

Overt Acts #10 - 15 and
Embezzlement Counts #6 -11

GOVERNMENT EXHIBIT 2100

766

A.T.T.S. - Disbursement from Adorno, Zeder - $1,297,000,
Sept. - Oct., 1989

GOVERNMENT EXHIBIT 2200

Overt Acts #22-45
Money Laundering Counts #17-40

**Disbursement of $462,400. from Olympia Acquisition Sept. 20 - 25, 1989**

Olympia Acquisition Corp.
Summit Trust Co.
#028300239

9/21 $144,000.   9/25 $318,400.

Fairview Financial Corp.
Summit Trust Co.
#028300204

9/21 $120,000.   9/25 $317,100.

Equity Finance Group
Summit Trust Co.
#028300182

9/21 $120,000.   9/22 $325,000.

Compton Press, Inc.
Operating Acct.
Summit Trust Co.
#028300174

Glenfed Financial Corp.
Check #1012

9/21 $120,000.

Compton Press, Inc.
General Acct.
Summit Trust Co.
#001394606

GOVERNMENT EXHIBIT 2300

768

Disbursement of $148,800. from Olympia Acquisition
Sept. 28 - 29, 1989

(Non-Plan Source)

Ocean Properties
Summit Trust Co.
#28300220

9/29*
$1,200.

Olympia Acquisition
Summit Trust Co.
#28300239

9/28
$150,000.

Squires, Sanders
& Dempsey
Law Firr
Check #1010

* Covers Overdraft

2/A-2

GOVERNMENT
EXHIBIT
2400
CARDOZA 800-703-6399

## Disbursement of $116,000. from Olympia Acquisition
## Oct. 4 - 6, 1989

```
                    Olympia Acquisition
                    Summit Trust Co.
                    #028300239
```

10/5 $75,000.

10/5 $38,385.

10/10 $1,000

10/6 $1,550.

```
Jacob Der Hagopian          Fairview Financial                Ocean Properties, Inc.
N. J. National Bank,              Corp.          10/6          Summit Trust Co.
Trenton                     Summit Trust Co.    $1,500.        #028300220
                            #028-300204
```

10/5 $35,000.

10/5 $3,000.

```
Susan Pellulo              Equity Finance
Coconut Grove                  Group
Bank                       Summit Trust Co.
#010064304500              #028300182
```

10/5 $3,000.

```
Compton Press, Inc.
Operating Account
Summit Trust Co.
#028300174
```

2/A-3

GOVERNMENT
EXHIBIT
2500

**Disbursement of $ 84,681. from Compton Press - Operating Account**
**Oct. 17 - 19, 1989**

GOVERNMENT EXHIBIT 2600

2fA-4

**National Media**
**Liquidation and Transfer of $1,700,000. UNUM Pension Funds**
**Nov.-Dec., 1989**

UNUM Life Insurance
Compton Press, Inc.
Profit Sharing Plan
Group Annuity Contract #91745

$330,000

Liquidation Charge

11/30 $1,400,000.

Compton Press, Inc.
Operating Acct.
Summit Trust Co.
#28-028300174

$400,000.

See Chart #3/A

12/1 $1,000,000.

12/4-5 $900,000.
C.Ch.#159400

Equity Finance Group
Summit Trust Co.
#28-028300182

12/1 $1,000,000.

Adorno, Zeder, Allen
United National Bank
Miami, FL
#0031128853

12/1 $1,000,000.

Nursery Acquisition
Corp.
(Ch.# 2195)

12/1 $100,000.

12/7 $900,000

Equity Finance Group
Summit Trust Co.
#28-028300182

12/7 $900,000.

Web Press, Inc.
D/B/A Balin Printing, Inc.
Summit Trust Co.
#28-028300298

12/7 $900,000.

Media Partners, Inc.
Summit Trust Co.
#28-028300301

12/7 $900,000.

Wilentz, Goldman &
Spitzer Trust Acct.
Amboy National Bank
#0130699

■ Overt Acts #16 & 17 and
Embezzlement Count #12

■ Overt Act #46 and
Money Laundering Count #41

GOVERNMENT
EXHIBIT
3000
CR89-132/69-763-E464

772

**Disbursement of Approximately $400,000. from Compton Press Operating Account Dec. 1 - Dec. 8, 1989**

Compton Press, Inc.
Summit Trust Co. - Operating Acct.
#28-028300174

12/1 $5,000.
12/4 $6,500.
12/5 $17,500.
12/6 $2,500.
12/6 $3,400.
12/7 $11,000.
12/8 $12,100.
12/7 $2,000.

Equity Finance Group
Summit Trust Co.
#28-028300182

Total: $140,000.

12/1 $5,000.
12/4 $6,500.
12/5 $17,500.
12/6 $8,500.
12/6 $8,400.
12/7 $11,000.
12/8 $9,300.
12/7 $2,000.

Web Press, Inc.
Media Ptrs., Inc.

Fairview Financial Corp.
Summit Trust Co.
#28-028300204

Total: $135,200.

$135,710.

| Date | Description | Amount |
|---|---|---|
| 12/1 | Richard & Richard Trust - wire | $ 5,000.00 |
| 12/1 | American Express - Ch. #1190 | 1,026.67 |
| 12/1 | Hotel Plaza Athenee - Ch. #1191 | 11,637.91 |
| 12/4 | Keith Swenson - wire | 2,500.00 |
| 12/4 | One Plaza Corp. - Op. - wire | 25,000.00 |
| 12/4 | One Plaza Corp. - Payroll - wire | 25,000.00 |
| 12/4 | Silver Sands Inv., Inc. - wire | 25,000.00 |
| 12/4 | Homelife Insurance - Ch. #1219 | 6,000.00 |
| 12/5 | Jet Aviation Business Jets - Ch. #1221 | 6,000.00 |
| 12/5 | Silver Sands Inv, Inc. - wire | 10,000.00 |
| 12/6 | Airborne Express - Ch. #1230 | 3,450.42 |
| 12/6 | Pincus, Dveroll, & Ganz, P.C. - Ch. #1229 | 7,500.00 |
| 12/7 | Rubinstein & Binder - Ch. #1237 | 9,107.50 |
| 12/1- 7 | Sundry Unidentified Checks | 2,185.40 |

Total: $140,000.

12/5 $127,250.
12/6 $56,000.
12/7 $13,100.

Compton Press, Inc. Summit Trust Co. General Acct. #010011394608

12/6 $13,100.
12/5 $56,000.

Cash Overdrafts in Compton Press General Acct.
12/4 $164,221.
12/5 56,000.
12/6 13,100.

12/4 $127,250.

Total: $198,350.

11/30 $2,245.

To Cover Existing Overdraft

12/1 $21,361.

Compton Press, Inc. Shearson, Lehman, Hutton (11/8) Ch.#1105

12/5 $362.50

Oxford Resources for '87 Jeep Cherokee (11/27) Ch. #1101

12/5 $800.

Vizcayans for Cooney (11/17) Ch.#1095

12/1 $11,949.95

Prime Time Transportation (12/5) ch.#1112

12/7 $5,569.07
12/1 $5,569.07

Camilo Muebles,Inc. for Office Furniture (10/30) Ch.#1086
(11/27) Ch.#1103

12/6 $267.10

Micro Age for UPS (11/27) Ch.#1100

12/1 $5,000.
12/6 $5,000.

Concorde Consultants, Inc.
(11/29) Ch.#1106 (11/30) Ch.#1030

12/5 $2,039.89

American Express (11/29) Ch.#1107

12/1 $344.15

Bell South Mobility for Florida Car Phone (11/20) Ch. #1096

12/5 $36.

South Florida Business Journal (11/28) Ch. #1104

Total: $60,743.

Int Acts #47-59
money Laundering Counts #42-54 ✓

TOTAL EXPENDED: $397,093.

GOVERNMENT EXHIBIT 3100

3/A

Disbursement of $900,000. from Wilentz, Goldman & Spitzer
Dec. 12-14, 1989

GOVERNMENT EXHIBIT 3200