UNITED STATES of America,

v.

**Harilaos APAZIDIS, Defendant.**

No. 10–cr–0707 (NG).

United States District Court,
E.D. New York.

May 17, 2011.

Martin Edmund Coffey, United States Attorneys Office, Brooklyn, NY, for United States of America.

### *OPINION & ORDER*

GERSHON, District Judge:

On February 1, 2011, defendant Harilaos "Harry" Apazidis was convicted by a jury of twenty-three counts (Counts Two through Four and Counts Six through Twenty–Five) charged against him in a twenty-five count indictment. The government requested forfeiture in a total amount of $800,000 on each of Counts Two through Four and, in the aggregate, on Counts Six through Twenty–Five. The jury found in the government's favor. Counts Two through Four charged that Apazidis made false statements to a feder-

ally insured financial institution for purposes of obtaining a loan, in violation of 18 U.S.C. § 1014. Counts Six through Twenty–Five charged that he engaged in monetary transactions over $10,000 which involved criminally derived property, in violation of 18 U.S.C. § 1957; these Counts were based on defendant's expenditures of the loan proceeds. The jury acquitted the defendant of Count One, conspiracy to make false statements to a federally insured financial institution, in violation of 18 U.S.C. § 371, and Count Five, mail fraud, in violation of 18 U.S.C. § 1341.

■■■■ Defendant now moves for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. Rule 29(a) provides that "the court on the defendant's motion must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction." "A defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient." *United States v. Cruz,* 363 F.3d 187, 197 (2d Cir.2004). As "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence," *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir.2003), when there are such competing inferences, the court must defer "to the jury's choice." *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998). "The ultimate question is not whether [the court] believe[s] the evidence adduced at trial established [the pertinent fact], but whether *any rational trier of fact could so find.*" *United States v. Payton,* 159 F.3d 49, 56 (2d Cir.1998) (emphasis in original). In reviewing a challenge to the sufficiency of the evidence to support a conviction, the court must "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in

the government's favor." *United States v. Torres,* 604 F.3d 58, 66 (2d Cir.2010).

■■■■ "While we defer to a jury's assessments with respect to credibility, conflicting testimony, and the jury's choice of the competing inferences that can be drawn from the evidence, specious inferences are not indulged." *United States v. Jones,* 393 F.3d 107, 111 (2d Cir.2004) (quotation marks and internal citations omitted). "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn,* 312 F.3d 58, 70 (2d Cir.2002) (quotation marks omitted). Nevertheless, "[o]ur evaluation looks at the evidence in its totality, and the Government need not negate every theory of innocence." *Id.* at 63 (quotation omitted). Thus, the court must review evidence offered at trial "as a whole, not in isolation." *United States v. Canady,* 126 F.3d 352, 356 (2d Cir.1997) (quotation omitted). "[T]he government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt." *United States v. Rodriguez,* 392 F.3d 539, 544 (2d Cir.2004). Indeed, "the jury's verdict may rest entirely on circumstantial evidence." *Jackson,* 335 F.3d at 180.

■■■■ At the close of the government's case, defendant moved under Rule 29. I reserved decision. Defendant's motion, therefore, must be "decided on the basis of the evidence at the time the ruling was reserved." Fed.R.Crim.P. 29(b). Accordingly, I will decide defendant's motion based solely on the government's case-in-chief.[1]

1. Although the court reserved decision at the close of the government's case, the parties

addressed the totality of the evidence, includ-

The unchallenged evidence at trial showed that defendant had owned a restaurant called the Silver Star Restaurant at 920 Washington Street, Weymouth, Massachusetts (the "Restaurant"), which he sold in April 2003, along with its furniture, equipment, and fixtures (with the exception of the walk-in freezer). Defendant retained the building, which he continued to lease to the Restaurant's owners.

The undisputed evidence also showed that, on August 4, 2004, defendant appeared for a loan closing at the Central Credit Union ("Credit Union") in Rego Park, New York. The stated purpose of the loan, on the loan application, was to "fix restaurant." The loan application also listed the address of the Restaurant and stated that Apazidis was the owner. Additionally, the loan file included a letter, which Apazidis signed, from Apazidis's loan broker, which stated that Apazidis was seeking the loan "for the complete renovation of the Silver Star Restaurant located at 910–920 Washington Street Weymouth, MA 02189."

The Credit Union approved the loan the same day. Although defendant initially requested only a $500,000 loan, he was ultimately approved for a loan of $950,000, and the Credit Union issued him a check for $800,200.[2] Based on the documents contained in the loan file, the government charged defendant with three Counts of making false statements for the purpose of influencing the Credit Union: Count Two alleged that defendant submitted a repair estimate that falsely stated the cost of repairs to the Restaurant; Count Three alleged that defendant falsely stated that

the purpose of the loan was to fix the Restaurant; and Count Four alleged that defendant falsely stated that he owned all furniture, fixtures, and equipment at the Restaurant.

Among the evidence the government produced was the loan file containing all of the documents presented to the Credit Union at the closing. The file consisted of the loan application, as well as supporting documents such as two estimates for repairs to the Restaurant, a security agreement pledging collateral for the loan, and a letter from defendant's loan broker which stated the purpose of the loan and described the collateral to be pledged. Each document in the loan file bore defendant's signature.[3] The government also presented detailed documentary evidence of defendant's subsequent financial transactions, which, in addition to proving Counts Six through Twenty–Five, demonstrated that defendant did not spend any loan proceeds on renovating the Restaurant.

Among the government's witnesses was defendant's cousin, Andreas Savvidis, a cooperating witness who had pled guilty to a conspiracy to make false statements to the Credit Union and who was instrumental in helping Apazidis obtain his loan. Savvidis testified that he put defendant in touch with a loan broker with whom defendant had conversations regarding what information would be necessary to provide to the Credit Union. 1/25/11 Trial Tr. at 505–09. Savvidis also testified that he was present at the closing of defendant's loan, at which he witnessed defendant sign documents contained in the loan file. Savvidis further

ing defendant's testimony. Nevertheless, in this portion of the opinion, I will consider only the government's case-in-chief.

**2.** The remaining $150,000 was dispersed to other individuals connected to the loan application process, such as defendant's loan broker.

**3.** As discussed further below, with the exception of the loan application itself, defendant did not dispute signing each document in the loan file.

testified that, although defendant originally requested only $500,000, while at the closing, defendant's loan broker suggested he might be able to get Apazidis $975,000.[4] Savvidis testified that, after hesitating a moment, defendant, without providing the Credit Union any additional credit information, agreed to the increase in the loan amount. *Id.* at 511. Savvidis further testified that, other members of his family, whom he helped obtain loans in a manner identical to the manner used for defendant, knew their loans were fraudulent. *Id.* at 499.

The government also presented the testimony of John Kritikos, a contractor with whom defendant met to obtain an estimate for repairs to the Restaurant. Kritikos testified that he never went to defendant's former Restaurant to take measurements for the equipment in the estimate, that he never had another conversation with defendant after providing the estimate, and that he never purchased any of the equipment referenced in the estimate. 1/20/11 Trial Tr. at 253. He also testified that defendant told him that he was using the estimate for "finance reasons." *Id.* at 257.

**Count Three**

Under Count Three, defendant was convicted by the jury of falsely stating on his loan application that the purpose of the loan was to "fix restaurant." Unlike the other signed pages in the loan file, which defendant did not challenge that he signed, Apazidis argued that the signature on the loan application was obviously a "crude forgery." Defendant argues, therefore, that the government presented insufficient evidence to establish that he represented

to the Credit Union that the purpose of the loan was to fix the Restaurant.

■ Defendant's assertion, that the "court itself can observe the application and see that the signature is forged," is unpersuasive. The loan application was contained in a loan file with several other pages, each admittedly signed by Apazidis; only the signature on the loan application was in dispute. It was reasonable for the jury to conclude that Apazidis himself had signed the loan application, just as he had signed every other document in the loan file. Moreover, the jury had numerous other signatures with which to compare the signature on the loan application. In addition to the signatures on the other documents in the loan file, the government introduced several checks undisputedly signed by Apazidis. The jury accepted the government's evidence that the signature on the loan application was Apazidis's, and the signature was not so different from the remainder of Apazidis's signatures as to render that finding unreasonable.

Alternatively, defendant argues that, even if he had signed the loan application, the government introduced insufficient evidence to prove that the statement was literally false, because Apazidis intended to repurchase the Restaurant. In support of this contention, defendant points to the cross-examination of Kritikos. Although Kritikos denied that Apazidis ever told him he had any plans to repurchase and renovate the Restaurant, defendant introduced an FBI Form 302 report of an interview of Kritikos.[5] According to the report, during the interview, Kritikos stated that Apazidis told him that Apazidis was going to take

---

**4.** Although Savvidis testified that the amount went up to $975,000, the documents reflect that the amount ultimately approved was $950,000.

**5.** Although defendant moved to admit the Form 302 report during Kritikos's testimony, it was not admitted until after the close of the government's case. It nonetheless will be considered as impeachment to Kritikos's testimony, and part of the government's case.

back the Restaurant to operate it himself. The report further stated, however, that, after Apazidis called Kritikos a "couple of times" regarding the estimate, Kritikos informed Apazidis that he could not provide a very accurate estimate without visiting the Restaurant. Apazidis then told Kritikos that he "only needed ballpark figures for something nice." 1/25/11 Trial Tr. at 733. When Kritikos was asked on cross-examination whether he told the agent that Apazidis planned to take back the Restaurant, Kritikos testified that he did not. When pressed further, he testified that he did not "remember saying that [to the agent]." 1/20/11 Trial Tr. at 262.

The government presented sufficient evidence that defendant's stated purpose for the loan was false at the time he submitted the application. The evidence established that when he submitted the application, Apazidis did not own the Restaurant; nor did he ever use any loan proceeds to purchase equipment for the Restaurant. In addition, the government presented evidence that, when Apazidis submitted the loan application, there was already in place an agreement to sell the Restaurant to a different buyer. *Id.* at 230. Apazidis knew of this buyer *no later* than August 6, 2004, two days after he submitted his loan application.[6] The jury was free to infer from these undisputed facts that defendant did not intend to fix the Restaurant with the proceeds from the loan.

The FBI Form 302 report does not negate the reasonableness of the jury's conclusion. Although the report called into question Kritikos's testimony, it did not, in light of the other evidence the government introduced, preclude the jury from concluding that Apazidis did not intend to use the proceeds of the loan to fix the Restaurant.

**Count Two**

Under Count Two, defendant was convicted of submitting to the Credit Union, in connection with his loan application, an estimate he knew falsely estimated the cost of certain repairs and equipment. This estimate was separate from the estimate discussed above regarding Count Three. The loan file defendant submitted contained two different estimates, both purportedly from Kritikos. One handwritten estimate, for approximately $190,000, which Kritikos (and defendant) testified was accurate and was obtained by defendant, and one typed estimate, for approximately $760,000, the subject of Count Two (which Kritikos testified he had never seen).[7] Combined, the two estimates equaled approximately $950,000, which is also the total loan amount approved.

Defendant does not dispute that the $760,000 estimate falsely stated the cost of repairs; nor does he dispute that he signed the false estimate that was included in the loan application. Rather, defendant's sole argument is that the government failed to introduce sufficient evidence to establish that he knew the contents of the $760,000 estimate at the time he signed it.

 Defendant's signature on the estimate is prima facie evidence of his knowledge of the contents. *See United States v. Ruffin*, 575 F.2d 346, 354 (2d Cir.1978) (approving a jury instruction that the jury could infer from the defendant's signature on a tax form that he was aware of the contents); *United States v. Tolkow*, 532

---

6. On August 6, 2004, Apazidis, as lessor of the building, signed a document, for purposes of transferring the Restaurant's liquor license, that stated that the Restaurant's buyer had the legal right to occupy the premises.

7. Defendant testified that he had no part in obtaining this estimate. As discussed further below, however, even if defendant's testimony were relevant to this motion, it would not change the outcome.

F.2d 853, 857 (2d Cir.1976), *rev'd on other grounds, United States v. Brutus,* 505 F.3d 80, 87 (2d Cir.2007) (holding that a defendant's "undisputed signature ... is prima facie proof of his knowledge of [the] contents" of the document). Moreover, the signature was a mere inch below the estimate amount. As the government argued at trial, the proximity of defendant's signature to the false estimate further belies defendant's claim that the evidence was insufficient to support the jury's verdict.

Defendant argues that the testimony of two government witnesses prevented a reasonable jury from finding defendant's knowledge. First, defendant points to the testimony of Savvidis that defendant moved quickly through the pages of the loan application, signing each page where the stickers indicated a signature was necessary. Second, defendant points to the testimony of Gloria Voulgaris, the secretary of defendant's loan broker, who, the defendant asserts, testified that she "believed that she prepared [the estimate] with information she received from [defendant's loan broker]."

Savvidis did not testify that defendant was unaware of the contents of the estimate. Rather, his testimony, if accepted by the jury, merely suggested that defendant may not have taken the time at the closing to review each document in detail. Savvidis also testified, however, that defendant, well in advance of closing the loan, discussed with his loan broker what information would be necessary to obtain the loan and that defendant provided the broker with pertinent information. 1/25/11 Trial Tr. at 505–09.

Likewise, Voulgaris did not testify that she prepared the false estimate. Rather, when asked by the government whether she created or prepared the document, she testified that, although she did not recall creating the document, it was possible. *Id.* at 438.

In sum, the testimony defendant points to, when viewed in the light most favorable to the government, does not, as a matter of law, preclude a reasonable inference of defendant's knowledge. In light of the significant amount of money at issue, the defendant's signature on the estimate, and numerous conversations prior to closing regarding information required for the loan application, it was reasonable for the jury to conclude that defendant was aware of the contents of the estimate, even if he did not review the documents at the closing. The government therefore presented sufficient evidence for a jury to conclude that defendant acted with knowledge when he submitted the false estimate to the Credit Union.

**Count Four**

██ Under Count Four, defendant was convicted by the jury of submitting a security agreement, in connection with his loan application, that fraudulently purported to provide the Credit Union with a security interest in all furniture, fixtures, and equipment of the Restaurant. The government introduced undisputed evidence that defendant did not own all of the furniture, fixtures, and equipment in the Restaurant.

As with Count Two, defendant argues that the government presented insufficient evidence to establish that he knew the contents of the security agreement he signed. For the reasons stated in discussing Count Two, this argument is rejected.

Alternatively, defendant argues that, even if he knew of the contents of the security agreement, the security agreement was literally true. Defendant argues that the security agreement did not purport to provide the Credit Union with all the furniture, fixtures, and equipment in the Restaurant, but rather, only those that defendant owned (*i.e.,* the walk-in freezer).

An examination of the security agreement belies this assertion.

Under the section titled "Collateral," the security agreement states, "The collateral in this agreement is . . .," and it proceeds to list four properties owned by defendant. One of these properties is 920 Washington St., Weymouth, MA, 02189, the location of the Restaurant. Directly beneath the list of properties is the statement, "All furniture, equipment, and fixtures." Moreover, on the same page, under a section titled "Ownership of the Collateral," defendant represented, "I own the collateral and no one else has any interest in it or claim against it." The security agreement is unambiguous. Therefore, the government presented sufficient evidence for a jury to conclude that defendant pledged "all furniture, equipment, and fixtures" in each of the four properties listed, including the Restaurant, and that he falsely represented that no one else held any interest in the collateral.

## Counts Six Through Twenty–Five

Under Counts Six through Twenty–Five, defendant was convicted by the jury of engaging in monetary transactions over $10,000, which involved criminally derived property. Defendant does not dispute that he engaged in the transactions underlying each Count. Rather, defendant argues, without authority, that his convictions on Counts Six through Twenty–Five should be set aside because the "money expended by Mr. Apazidis was not the product of the bank fraud . . . of which he was charged."

In support of his argument, defendant points to evidence that, soon after receiving the proceeds of the loan, before he had a chance to cash the check, defendant loaned the proceeds to his cousin, Savvidis. Barely a week later, Savvidis repaid the proceeds to Apazidis, who then engaged in the monetary transactions charged in Counts Six through Twenty–Five. On the basis of this evidence, defendant argues, as he did to the jury, that he was not using proceeds of the ill-gotten bank loan, but rather, proceeds of his loan to Savvidis. This argument is without merit.

■ The jury was correctly charged that the term proceeds means "property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity." The government presented sufficient evidence that defendant's expenditures fell within this definition, and the jury was free to reject defendant's argument that, in light of the loan to Savvidis, he was no longer spending proceeds. Therefore, the government presented sufficient evidence to support Counts Six through Twenty–Five.

## Forfeiture Amount

The jury also returned a verdict against defendant on the issue of forfeiture, in the amount of $800,000. Defendant argues that the forfeiture verdict should be set aside if the court sets aside Counts Two through Four. Defendant also argues, without authority, that the forfeiture amount found by the jury should be reduced by the amount defendant repaid to the Credit Union prior to defaulting on the loan. Defendant never presented this argument to the jury, nor did he object to the forfeiture jury charge which did not include any instruction on a set-off. Nevertheless, a brief review of this argument reveals that it is without merit.

■ Defendant was found liable for the full $800,000 in forfeiture sought by the government under 18 U.S.C. § 982(a)(2)(A), which is applicable to Counts Two through Four, as well as under 18 U.S.C. § 982(a)(1), which is applicable to Counts Six through Twenty–Five. Section 982(a)(2)(A) provides that the government may obtain forfeiture of "[A]ny property, constituting or derived from,

proceeds the person obtained directly or indirectly ... [from a violation of Section 1014]." Under § 982(a)(2)(A), defendant is not entitled to a set-off for any portion of the loan that was repaid to the lender. *See United States v. Boulware*, 384 F.3d 794, 813 (9th Cir.2004), *rev'd on other grounds*, 552 U.S. 421, 128 S.Ct. 1168, 170 L.Ed.2d 34 (2008); *United States v. Rudaj*, 2006 WL 1876664, at *4, 2006 U.S. Dist. LEXIS 45080, at *12 (S.D.N.Y. July 5, 2006). Section 982 incorporates the forfeiture provisions of 21 U.S.C. § 853(c), which state that "all right, title, and interest in property described in subsection (a) of this section vests in the United States *upon the commission of the act* giving rise to forfeiture under this section" (emphasis added); *see also Boulware*, 384 F.3d at 813.

Likewise, defendant is not entitled to a off-set under § 982(a)(1). Section 982(a)(1) provides that the government may obtain forfeiture of "any property, real or personal, involved in [an unlawful monetary transaction], or any property traceable to such property." If a defendant is found to have forfeitable property involved in an unlawful monetary transaction, he is not entitled to a set-off for the amount the victim was able to recover. *See United States v. Pelullo*, 961 F.Supp. 736, 761 (D.N.J.1997) ("Unlike statutory restitution provisions, [Section 982(a)(1)] makes no provision for a set-off by reason of the victim's recovery."); *United States v. Demik*, 2005 U.S. Dist. LEXIS 28916, at *5–6 (N.D.Tex.2005) (same). Also, like § 982(a)(2)(A), section 982(a)(1) "is governed by" the provisions of 21 U.S.C. § 853(c), which vests in the United States, upon commission of the unlawful monetary transaction, "all right, title, and interest" in the forfeitable property.

Therefore, defendant is not entitled to a reduction in his forfeiture amount.

## Other Issues

Finally, I note that, at the close of defendant's case, after the jury returned its verdicts, defendant "renewed" his Rule 29 motion. Although I reserved decision on the Rule 29 motion at the close of the government's case, and therefore have, up to now, considered only the government's case in chief, defendant's "renewal" could be construed as requiring the court to also examine the totality of evidence presented at trial, including defendant's case, which consisted of his own testimony.

■ Viewed in that manner, the Rule 29 motion borders on frivolous. As was laid out in detail in the government's summations, the defendant's testimony was rife with inconsistencies and implausibilities. The jury also had a full opportunity to observe defendant's demeanor on the witness stand. On this basis, it was reasonable for the jury to reject defendant's testimony, thereby strengthening the government's case. *See United States v. Stanley*, 928 F.2d 575, 577 (2d Cir.1991) (stating that a "jury is entitled to disbelieve [a defendant]'s testimony, and use its disbelief to supplement the other evidence against him").

For the reasons stated above, defendant's Rule 29 motion for a judgment of acquittal and for a reduction in the amount of forfeiture are DENIED.

**SO ORDERED.**